**Lisellotte MOYER, as widow of Larry Eugene Moyer, and as Administratrix of the Estate of Larry Eugene Moyer, deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendants.**

**No. 66–601.**

United States District Court
S. D. Florida.

Nov. 12, 1969.

J. Arthur Hawkesworth, Jr., and D. Fredrico Fazio, of Hawkesworth & Kay, Miami, Fla., for plaintiff.

John G. Laughlin, Chief, Torts Section, Dept. of Justice, and Philip Silverman, Dept. of Justice, Washington, D. C., for the United States.

## OPINION

LAYTON,[*] District Judge.

On February 7, 1964, the United States Air Force issued a technical order,[1] T.O. 876, to direct certain modifications on the ejections seats for B–57A and RB–57A aircraft. Pursuant thereto, modifications were made in the ejection seat of a B–57A, Number AF 52–1469. On April 22, 1964, Larry Moyer, deceased husband of the plaintiff, was accidentally ejected from this aircraft, an RB–57A bomber, AF 52–1469, while the bomber was on the ground. Moyer was killed on impact with the ground. An action was brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), against the United States and against two corpora-

---

[*] Sitting in the United States District Court for the Southern District of Florida by assignment.

1. The order was prepared under the supervision of the San Antonio Air Material Area (SAAMA), which had overall re-sponsibility for ejection seat systems for the Air Force, at the direction of Warner Robbins Air Material Area (WRAMA), which had overall responsibility for the B–57 type aircraft.

tions [2] which designed the aircraft and the ejection seat. For simplicity, the jury empaneled for the corporate defendants was accepted by the Government as an advisory jury pursuant to Rule 39(c) of the Federal Rules of Civil Procedure.[3] During the trial, the Court granted motions for directed verdicts in favor of both of the corporate defendants.

The jury found that the United States was negligent: (1) in delivering the aircraft and ejection seat in question to American Airmotive when the United States knew, or should have known, that the seat was improperly designed and manufactured; and (2) in preparing and issuing Technical Order No. 876. Further, the jury found that the negligence of the United States was the, or one of the, proximate causes of Moyer's death, and that the United States had not established that Moyer was guilty of negligence which was a contributing, proximate cause of his death. The jury then assessed plaintiff's damages in the sum of $700,000.00.

Subsequently, the case was submitted to this Court on post trial memoranda pursuant to Rule 52(a). Rule 52(a) provides, in pertinent part:

> "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon * * *."

The United States filed a motion to dismiss the suit for lack of jurisdiction over the subject matter based on 28 U.S.C. § 1346(b) and § 2680. In an opinion filed August 12, 1969,[4] I granted the United States' motion to dismiss with regard to the charges of negligence relating to the design of the aircraft and ejection seat, and denied it as regards the charges of negligence going to the preparation of Technical Order No. 876.

Now, it remains to be decided,[5] whether the United States was negligent in the preparation and dissemination of T.O. 876, whether this negligence was the, or one of the, proximate causes of Moyer's death and whether Moyer was negligent, which negligence was a contributing, proximate cause of his death. While this case thus involves commonplace principles of tort law, the facts underlying these critical events require careful examination.

## FACTS

The particular plane involved in this accident, AF 52–1469, was sent to American Airmotive (Airmotive) for repairs for damage to its fuselage caused by an emergency landing in Alaska. To accomplish this work, the pilot's seat was removed from the aircraft and placed on a bench. While the plane was undergoing these structural repairs at Airmotive, T.O. 876 was issued by the Air Force which directed several modifications on the ejection seat used in this type of airplane. After learning about T.O. 876, Airmotive requested that it be permitted to do the seat modifications while the plane was still at its plant. It received approval from WRAMA some time in March, 1964. The work was assigned by Airmotive to a sheet metal worker named Al Bass.[6]

Bass went to the bench where the seat was lying and commenced the modifications. He testified that he followed the technical order in chronological order, which meant that he first made the modifications called for in paragraphs j to l,

2. Martin Marietta Corporation and Aircraft Mechanics, Inc.

3. At the request of Judge Eaton who presided over the pretrial proceedings.

4. Moyer et al. v. United States, 302 F. Supp. 1235 (S.D.Fla.1969).

5. Under Rule 52(a) F.R.Civ.P., the verdict of the advisory jury is advisory only. The Court must find the facts independent-ly and is in no way bound by the verdict of the advisory jury. Chicago and North Western Ry. Co. v. Minnesota Transfer Ry. Co., 371 F.2d 129, 130 (8th Cir. 1967); Reed v. Riddle Airlines, 266 F.2d 314, 319 (5th Cir. 1959).

6. Bass testified that he did not remember his exact classification at the time of the accident, but that he had six years experience as a sheet metal worker.

requiring the addition of a trigger guard on the right arm of the seat to prevent inadvertent activation of the ejection mechanism.[7] After accomplishing this work, he started the work directed in paragraphs q and r. Paragraphs q and r read as follows:

q. For pilot's position only—lower right-hand arm rest and assure that a 1/8 inch clearance is obtained between pin (installed) and top side of seat bucket as shown in Figure 2, Instruction No. I. Locate and drill a 3/16 inch (0.1875) hole at right angle to arm rest support, Part No. 505–31010R, aligned fore and aft, through arm rest support, to facilitate installation of a down stop, as shown in Figure 2, Instruction No. 2.

r. Install bolt, Part No. AN173–7, and nut, Part No. AN363–1032, on arm rest support, Part No. 505–31010R. (Reference Figure 2, Instruction No. 3—pilot's position only.)

The purpose of the bolt described in paragraph r, which acted as a down stop, was to prevent a new safety pin, installed in the arm rest, from hitting the seat bucket when the arm rest was in the down position.[8]

The plaintiff's case was largely based on the testimony of Bass concerning why and when he removed the roll pin. According to Bass, he made a mistake in locating and drilling the hole for this bolt and ended up with a clearance of over 1/8 inch.[9] When he realized this mistake, he went to his lead mechanic, Cohen, and told him about the problem. Cohen and Bass then made two important decisions, both incorrect: (a) that this was a mistake which should be corrected; (b) the *only* way to do this was to remove the arm rest assembly from the seat and then to grind down the sleeve or collar on which the bolt rested.[10] According to

7. More particularly, trimming the hand grip and attaching the new handle and improved trigger guard. There were two ways that the arm rest assembly could be disassembled to do this work; disassembly from the top as directed by the technical order, or disassembly from the bottom not contemplated by the technical order. The former and correct way involved the removal of a part called a ring truarc which held the arm rest support to the arm rest. The latter, incorrect, way required the removal and possible destruction of the roll pin which, as a safety device, prevented the arm rest support from passing upwards through the collar which held it to the seat.

8. In the RB–57A bomber, the right arm rest goes up and down to allow the pilot to climb into the seat. This arm rest, which contains the trigger mechanism for the ejection system, is hinged at the rear and supported at the front by a telescoping tube or sleeve (arm rest support in paragraph q). This tube passes through a collar or sleeve which contains a spring-loaded pin. Once the pilot is in the seat, he pulls the arm rest up to the horizontal. The spring-loaded pin goes into a hole in the tube and holds the arm rest in this position. When the pilot wants to leave the seat, he reaches over and pulls out the spring-loaded

pin. The tube then slips down through the collar lowering the arm rest and allows the pilot to climb out of the seat.

9. Bass failed to take into account that the bolt, once installed, would rest with its head and nut on the collar or sleeve instead of resting on its shank. Thus, when the bolt was installed in the hole which he drilled, there was a clearance of 1/16 inch, greater than the 1/8 inch called for in paragraph q.

10. As stated in note 7, supra, there were two ways in which the arm rest assembly could be disassembled: from the top by removing the ring truarc; and from the bottom by removing the roll pin. According to Bass, when he made his mistake, the work on the trigger guard had already been completed. Therefore, he stated that both he and Cohen felt that the only way to make the correction was to disassemble the arm rest assembly from the bottom by removing the roll pin. I agree that as a question of mechanics, this would be the only way to disassemble the arm rest assembly if the work on the trigger was completed when the mistake occurred. The question is whether the arm rest assembly needed to be disassembled to make the correction. The Government argued that there was an easier way to make the correction. I

Bass, the only way to remove the arm rest assembly was to disassemble it from the bottom by removing a roll pin. This roll pin acted as a stop and prevented the arm rest support from slipping upward through the collar when the arm rest was pulled up to the horizontal position by the pilot. Bass removed this roll pin. Because of the nature of the roll pin,[11] he was forced to exert a great deal of effort to remove it, and stated: "I didn't get it out easy, but I got it out." After removing the roll pin, he ground down the collar to insure the 1/8 inch clearance called for in paragraph q, and then reassembled the arm rest assembly. A tragic oversight was made at this point. He forgot to replace the roll pin and, because it was late in the day, went home, leaving the pin in his tool box. This pin remained in Bass's tool box until he found it after the accident. The seat was subsequently inspected, although no one noticed the missing roll pin. Apparently, the seat was then replaced in the plane.

On April 22, 1964, Moyer was scheduled to test-fly AF–52–1469 to check the repairs made on the fuselage. He made his normal exterior check of the plane with the ground mechanic, Seftchick, and then climbed inside. There he pulled the seat initiator pins and then climbed into the pilot's seat.[12] He reached to his right and, while holding out with one hand a spring-loaded pin located in the collar,[13] he jerked the arm rest upward with the other hand. Because the spring-loaded pin was held out by Moyer, and because the roll pin was missing, the arm rest did not stop at the horizontal position and, instead, continued upwards towards the vertical. At some point in its ascent, the movement of the arm rest had the same effect on the trigger mechanism as squeezing the trigger. The seat ejected and Moyer was catapulted some one hundred feet into the air. He died on contact with the macadam runway.

The accident was caused by three events acting in conjunction with one another. First, Moyer pulled the safety, or initiator pin,[14] which activated the seat cannon, before he climbed into the seat. Second, Moyer held out the spring-loaded pin [15] which normally would have caught in a hole in the ascending arm rest support and which would have stopped the arm rest at some point near the horizontal position. Third, the ultimate safety stop, the roll pin, which was meant to prevent this exact type of accident, had been removed and rested in Bass's tool box.

do not resolve this question because I have found that the roll pin was removed earlier and, therefore, discount the theory that it was removed to correct a mistake which Bass made in following paragraph q.

11. A roll pin is a metal pin with a cut in one side. This pin can be slightly compressed and driven into a hole which is smaller than the original diameter of the pin. When the pin is driven in, it expands against the sides of the hole and is very difficult to remove.

12. In the RB–57A bomber when the pilot is getting into his seat, a ground mechanic stands with his head up into the aircraft through the access hole in the underside of the plane in order to assist the pilot in getting ready for take-off. In this case, the ground mechanic, Seftchick, testified as to Moyer's actions from the moment he entered the plane to the time that he was ejected.

13. The spring loaded pin was designed to catch in holes in the arm rest support tube and would stop the arm rest from passing the horizontal position. See note 8, supra.

14. Moyer is charged with contributory negligence in two respects: (a) pulling the safety pins before the seat arm rest was raised; and, (b) holding out the spring-loaded pin while the arm rest was raised. I do not decide this issue because it is unnecessary in the light of the result reached, but it is a fact that had Moyer followed the instructions in the Air Force Manual and not pulled this initiator pin until after raising the arm rest and had not held out the spring-loaded pin while raising the arm rest, the seat would not have ejected despite Bass's negligence. I shall consider these facts hereafter in connection with the Government's defense of intervening efficient cause.

15. *Id.*

The plaintiff contends that the United States breached a duty which it owed to Moyer and that this breach of duty or negligence was the proximate cause of his death. Specifically, the plaintiff argues that T.O. 876 was negligently drawn because it was vague and ambiguous. More particularly, she argues that paragraph q caused the mistake which Bass made in drilling the hole to install the bolt and nut as a down stop because the illustration accompanying it failed to show that the bolt head should lie on the flat and that this factor should go into the measurements for drilling the hole. Moreover, she says, while the ⅛ inch measurement was given with no tolerances, the order contained a note allowing for minor deviations which did not compromise the integrity of the system,[16] which served only to confuse Bass. On the one hand he was held to a specific measurement, while on the other, he was allowed to make minor deviations. She further contends that while Bass was negligent in failing to replace the roll pin which he removed, this negligence was not an intervening efficient cause, but rather a continuation of the negligence put in motion by the United States; the mistake in the placement of the bolt was inevitable, and the only way to correct this mistake to get the ⅛ inch clearance was to remove the roll pin in order to grind down the collar. This mistake was, therefore, foreseeable, she argues, and the United States should have guarded against both the removal and the failure to replace the roll pin by adding a warning about the vital function of the roll pin in the ejection seat. Finally, she contends that Moyer was not negligent in removing the initiator pins before climbing into the seat and in holding out the spring-loaded pin when pulling the arm rest up into the horizontal position, or that if he were negligent in

so doing, this negligence did not contribute to the accident.

The United States argues that it was not negligent towards Moyer, or if negligent, that it is not legally liable for his death. First, the Government argues that the T.O. was not negligently drawn for several reasons: (a) it made no difference whether the bolt rested on the flat or the apex; (b) there were step-by-step instructions for the work and all the parts and supplies were numbered; (c) the T.O. was prepared in accordance with the Military Specification on how to draw technical orders and was prepared in line with the prevailing practice in the sheet metal field; (d) there were no reported difficulties in following T.O. 876 from the date of issue, February 14, 1964, to the date of the accident, April 22, 1964, or even up to the time of trial, and there were no other mistakes reported in doing the modifications. Second, the Government argues that Bass deviated from the technical order when he removed the roll pin and that the only credible evidence is that he removed it to drill the holes and insert the rivets for the trigger guard and not to correct any mistake as the result of following paragraph q. Moreover, even if Bass removed the roll pin to correct a mistake, his failure to replace it was certainly not foreseeable and this failure was a major deviation from the technical order. The Government points out that it tried to foresee any minor mistakes in following the technical order and, therefore, included a note concerning minor deviations,[17] but could not foresee, and should not be liable for, major deviations such as the destruction or removal of an integral part of the ejection seat. Third, the removal of the roll pin was an intervening efficient cause which absolved it from liability because it was not a probable, as opposed to merely possible, consequence of its negligence, and did not follow in the ordinary and

16. T. O. 876 contained a note on minor deviations which read:
*Note*
"Minor deviations from the following procedures are permissible provided the

intent of this technical order is accomplished and the integrity of the ejection system is not compromised."

17. See note 16, supra.

natural sequence of events. Fourth, there was no notice, either actual or constructive, to the Government that the roll pin was out and would not be replaced, and the Government is not liable for a failure to inspect the work. And finally, even if the Government were negligent, and that negligence were one of the proximate causes of Moyer's death, the plaintiff is barred from recovery because the decedent's own negligence contributed to the accident, which resulted in his death.

Crucial to the plaintiff's theory is that the roll pin was removed to correct a mistake which inevitably resulted from following the "negligently" drawn T.O., rather than that it was removed at the outset to drill the holes in order to install the rivets on the trigger guard. Bass's testimony on this point is subject to grave suspicion. The physical evidence demonstrates that the rivet holes could not have been drilled without first removing the ring truarc or, in the alternative, removing the roll pin. Bass testified he never removed the ring truarc; that it was never removed; that he did not have the tools to remove it; that he didn't even know what it was. If this is true, as he testified, then he had to remove the roll pin to drill the rivet holes. If he removed the roll pin for that purpose, then it was not because of misleading instructions contained in what plaintiff refers to as a negligently drawn technical order. Thus, the force of plaintiff's contention is seriously weakened. I conclude, based largely on his own testimony, that Bass removed the roll pin to drill the rivet holes and was not misled by inept language in the technical order.

## CONCLUSIONS

In order to recover, the plaintiff must show that the Government was negligent in the preparation of T.O. 876 and that this negligence was a proximate cause of Moyer's death. Because the accident was the result of three concurring causes— the absence of the roll pin, the pulled initiator pins, and the by-passed spring-loaded pin—the plaintiff must link one of these three causes to some negligence on the part of the Government. The plaintiff does not attempt to attribute either of the latter two causes to the United States. Thus, the plaintiff must show that the Government's negligence was the proximate cause of the absence of the roll pin and through it, the death of Moyer.

After carefully reviewing the testimony and the documents introduced into evidence, I conclude that the Government was not negligent in preparing and distributing T.O. 876. Prepared for an experienced sheet metal worker, T.O. 876 defined the work to be done in a detailed step-by-step recital which included an identification and itemization of each of the parts involved. The plaintiff focuses her contention that the Government negligently prepared T.O. 876 on paragraph q thereof. Concededly, the expert witnesses called by the plaintiff testified that the technical order could have been more expertly drawn and paragraph q could have been clearer. More specifically, plaintiff's witnesses noted that, while paragraph q called for an assured $\frac{1}{8}$ inch clearance, it did not explain that the difference between the diameter of the bolt and the diameter of the nut must be taken into account. These experts explained that this omission caused the $\frac{1}{16}$ inch additional clearance realized by Bass. Further, one of plaintiff's experts indicated that the $\frac{1}{8}$ inch clearance spelled out in paragraph q required accuracy to one ten-thousandth of an inch because no specific tolerance was indicated. But, this testimony overlooks the note on minor deviations contained in the technical order,[18] which, in lieu of specific tolerances, recites that the mechanic has discretion to deviate from the technical order if the integrity of the system is not compromised and the intent of the order is accomplished. In view of this note, I conclude that a reasonable sheet metal mechanic should have realized that

18. See note 16, supra.

My finding that there was no negligence on the part of the United States in the preparation of this technical order and my conclusion of law drawn from the facts that, in any event, the injury was not a probable consequence of the "negligence"; in other words, that the "negligence" was not foreseeable and, thus, not a proximate cause,[20] necessarily results in setting aside the jury verdict. Because of the view which I take of the case, I do not reach the following issues: plaintiff's set-in-motion theory; contributory negligence;[21] and damages.

The result here reached may be regrettable because it not only goes contrary to the findings of a jury (which, however, I feel was largely the result of sympathy) but, also, deprives plaintiff and her children of a substantial recovery. But the United States in matters of this sort has no more responsibility than any other ordinary citizen; it is not an insurer. This accident, in my judgment, resulted solely from the negligence of American Airmotive and its servants, and it is most unfortunate that as the result of a quirk of state law, this corporation, rather than being financially liable to plaintiff for the full damages, can be compelled to pay little more than nominal monthly compensation by way of Workmen's Compensation.

What has been said above shall constitute both Findings of Fact and Conclusions of Law.

Let an order be entered in accordance with the above.

as distinguished from a natural and probable, result of the negligence, recovery will not be allowed." 40 So.2d at 149.

20. Whether these intervening acts might better be regarded as constituting an intervening, efficient cause rather than not a proximate cause, becomes academic.

21. Whether Moyer's actions above described constituted contributory negligence, which of itself was sufficient to bar recovery, it is not necessary to decide. Despite some equivocal statements in a mechanics' manual which I did not consider applicable, and certain exculpatory testimony from an expert witness, the fact remains that Moyer, in the two respects above discussed, failed to follow the instructions in his manual.