Lisellotte MOYER, etc., Plaintiff-Appellant,

v.

MARTIN MARIETTA CORP., etc., et al., Defendants-Appellees.

No. 29550.

United States Court of Appeals, Fifth Circuit.

June 18, 1973.

Rehearing Denied July 13. 1973.

5. Weems v. United States, 217 U.S. 349, 367, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910). See, United States v. Scales, 464 F.2d 371, 376 (6th Cir. 1972).

See also 306 F.Supp. 390.

Hawkesworth & Kay, Arthur J. Hawkesworth, Jr., Horton & Schwartz,

Alan R. Schwartz, Miami, Fla., for plaintiff-appellant.

Edward A. Perse, Carey, Dwyer, Austin, Cole & Selwood, Miami, Fla., for Martin Marietta Corp.

A. Lee Bradford, Dixon, DeJarnette, Bradford, Williams, McKay & Kimbrell, Miami, Fla., for Aircraft Mechanics, Inc.

Robert W. Rust, U. S. Atty., Miami, Fla., Philip Silverman, Daniel Joseph, Alan S. Rosenthal, Michael C. Farrar, Attys., Dept. of Justice, Washington, D. C., for U. S. A.

Before GODBOLD, SIMPSON and CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

Larry Eugene Moyer, a test pilot employed by American Airmotive, Inc., at Miami, Florida, was preparing to fly a B–57A aircraft owned by the United States of America on April 22, 1964, when the ejection seat was triggered while the plane was still on the ground. The pilot was thrown into the air by the explosive charge associated with the ejection seat and was killed instantly when he fell on the paved runway.

The widow and administratrix of the decedent, Lisellotte Moyer, brought suit for wrongful death in the court below, against the manufacturer of the aircraft, Martin Marietta Corporation (Martin)[1], the manufacturer of the ejection seat, Aircraft Mechanics, Inc. (Aircraft), and the United States. Jurisdiction for suit against the corporate defendants was based on diversity of citizenship. The jurisdictional basis for the action against the United States was Title 28 U.S.C. Sec. 1346(b) and the Federal Tort Claims Act, Title 28 U.S.C. Secs. 2672–2680.[2]

---

1. The B–57A aircraft involved in this case, No. AF–52–1469, was delivered sold to the United States by Martin in July, 1954.

2. Section 1346(b), Title 28, United States Code, reads, in pertinent part, as follows: "Subject to the provisions of chapter 171 of this title, the district courts . . . shall have exclusive jurisdic-

The claims against Martin and Aircraft were tried to a jury at the same time the court tried the tort claim against the United States. At the close of the plaintiff's case in chief, the trial judge directed a verdict in favor of the two corporate defendants.[3] The "Motion for Directed Verdict" of the United States was denied and the trial continued, the jury remaining as an advisory jury pursuant to Rule 39(c), F.R.Civ.P. At the conclusion of the evidence the jury found in answer to special interrogatories that the United States had been negligent both in the furnishing of an improperly designed aircraft and in preparing and issuing Technical Order No. 876,[4] that this negligence was a "legal cause" of Moyer's death, that Moyer had not been contributively negligent, and that Mrs. Moyer's damages were in the amount of $700,000.

Inasmuch as the verdict *was* purely advisory, the trial judge was required to make an independent decision as to the issues against the United States. He dismissed the action on the ground that it was barred by the "discretionary function" exception to the Federal Tort Claims Act, Title 28 U.S.C. Sec. 2680(a).[5] Moyer v. United States, S.D. Fla.1969, 302 F.Supp. 1235.[6] These rulings, as well as the instructed verdicts against the corporate defendants, are challenged by this appeal. We find merit in appellant's contentions and reverse and remand for further proceedings.

## UNDISPUTED FACTS

The B-57A aircraft in question, No. AF-52-1469 sustained damage to its fuselage in the course of an emergency landing in Alaska and was sent to American Airmotive, Inc., in Miami, Florida, for repairs. In the course of this work the pilot's seat was removed and placed on a bench. While the aircraft was undergoing structural repairs by Airmo-

---

tion of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

3. On the orally stated grounds that:
   " . . . on the question of intervening cause and weighing the facts of this case against the Florida law, I am of the view the convergence of a number of distinctly unusual and unrelated factors as necessary to the happening of this accident simply could not have been reasonably foreseen by either Martin Marietta or Aircraft Mechanics and were not happenings set in motion by the alleged negligence of the defendants." (T. 2488)

4. Which directed modifications on the seat ejection system in question and which had been the basis for making those modifications by employees of American Airmotive Corporation (Airmotive) a repairer of the aircraft under contract with the United States Air Force. Airmotive,

originally a third party defendant under a third party claim by the United States, as well as under a Third Party Claim (cross claim) by Aircraft, was granted summary judgments May 16, 1968, before the main suit went to trial.

5. Section 2680(a), Title 28, United States Code, provides:
   "The provisions of this chapter and section 1346(b) of this title shall not apply to—Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

6. In addition to relieving the United States of liability under the "discretionary function" exception, the district court exonerated the United States with respect to the preparation of Technical Order No. 876 directing modifications of the ejection seat with respect to the alleged negligence in the drafting of the order as a cause of the malfunction of the ejection seat. Moyer v. United States, S.D. Fla., 1969, 306 F.Supp. 390. No appeal was taken from the latter decision.

tive, the United States Air Force issued Technical Order No. 1B–57–876 directing several modifications to the ejection seat. Upon learning of the new technical order Airmotive requested permission of the Air Force to perform the modifications while the plane was still at its Miami plant. The Air Force approved this request in March, 1964, and Airmotive assigned its employee, Al Bass, to modify the ejection seat.

The purpose of the technical order was to install a new type of trigger guard for the ejection seat mechanism, which was located on the right-hand armrest. Bass, who was qualified as a sheet metal worker, carried out the modifications called for in paragraphs "j" through "l" of the technical order. He then proceeded to perform the operations directed by paragraphs "q" and "r" of the order. These latter paragraphs required the drilling of a hole through the right-hand armrest support to facilitate the installation of a down stop and the installation of a specified bolt in that hole. The purpose of the bolt, which acted as a down stop, was to prevent a new safety pin, installed in the armrest, from hitting the seat bucket when the armrest was in the down position.

Bass made a mistake in locating and drilling a hole for the new bolt and ended up with a clearance adjacent to the newly installed bolt in excess of the specified one-eighth of an inch. He then consulted with his lead mechanic, Cohen, and the two men made two important, but incorrect decisions: (a) that this excessive clearance had to be corrected; and (b) that the only way to make the correction was to remove the armrest assembly from the seat and then to grind down the sleeve or collar on which the bolt rested. Bass and Cohen determined that the only way to remove the armrest assembly was to disassemble it from the bottom by removing a roll pin. This roll pin was designed to act as a stop so as to prevent the armrest support from slipping upward

through the collar when the armrest was pulled up to the horizontal position by the pilot. Bass was required to use considerable force to remove the roll pin. After the pin was removed, he ground down the collar to insure the $\frac{1}{8}''$ clearance specified by the technical order. In reassembling the armrest assembly, Bass neglected to replace the roll pin. The roll pin was found in Bass' tool box after the fatal accident of April 22, 1964.

On April 22, 1964, prior to making a scheduled test flight in the B–57A aircraft, Moyer made the usual external inspection of the plane in the company of his ground mechanic, Seftchick. The pilot then climbed inside, pulled the ejection seat initiator pins, and climbed into the pilot's seat. Moyer reached to his right and, while holding out with one hand a spring-loaded pin located in the collar, he jerked the armrest (which had been lowered to permit entry into the pilot's seat) upward with the other hand. Because the spring-loaded pin was held out by Moyer, and because the roll pin was missing, the armrest did not stop at the horizontal position. As the armrest passed the horizontal position and headed towards the vertical position, it brought about the same action as if the trigger mechanism had been squeezed. Moyer and the seat were thrown one hundred feet into the air by the explosive charge. Moyer's death followed.

Three factors interacted to cause the activation of the ejection mechanism while the aircraft was on the ground: (1) the pilot pulled the initiator pins, which activated the explosive component of the seat, before he was seated in the pilot's seat; (2) the pilot held out the spring-loaded pin, which normally would have caught in a hole in the ascending armrest support and which would have stopped the armrest at some point near the horizontal; and (3) the ultimate safety stop, the roll pin, which was meant to prevent this type of accident, had been removed and not replaced by Bass.

## THE COMPLAINT

Mrs. Moyer's complaint alleged, with respect to Martin, that the pilot's seat and ejection mechanism had been negligently designed and manufactured in the following aspects: (1) the spring-loaded pin was too weak to catch and lock properly; (2) the roll pin was removable and not adequately marked as a safety feature; (3) the ejection mechanism was incorporated into the pilot's right-hand armrest; and (4) the initiator pins were not identified by streamers or otherwise. The complaint also alleged a proximate causal relationship between the allegedly improper design and manufacture, or the selection of equipment for the B–57A aircraft and the death of Moyer caused by the ejection of the seat while the plane was on the ground on April 22, 1964, and resultant damages. Similar allegations of negligence and proximate causation were made against Aircraft Mechanics, Inc., the manufacturer of the seat and ejection mechanism.

Two theories for recovery were asserted by plaintiff against the United States. The first one alleged that Technical Order 1B–57–876 was drafted in a vague, ambiguous and negligent manner in that it failed to provide adequate instructions for the modification of the right armrest of the pilot's seat.[7] The second alleged that the United States negligently furnished to American Airmotive, Inc., the aircraft and seat in question when it knew or should have known that the seat was improperly designed and manufactured in that: (1) the ejection mechanism was incorporated into the right-hand armrest which had to be moved up and down each time the pilot entered and left the aircraft; (2) the initiator pins meant to prevent inadvertent jettisoning of the ejection seat were not properly marked so as to warn of the danger inherent in their premature removal; and (3) the spring-loaded mechanism used to raise and lower the right armrest was inadequately designed because it failed to stop the armrest from inadvertently slipping into an ejection position. Finally, the complaint as to the United States alleged that as a proximate and direct result of the negligence of the United States the pilot's seat was inadvertently ejected while the pilot was preparing the plane for take-off causing Larry Eugene Moyer "great mental pain and suffering and ultimate death."

## THE ANSWERS

Martin answered the complaint by denials that it had negligently designed and equipped the B–57A aircraft in question. Martin alleged as an affirmative defense that Moyer's negligence was the sole proximate cause of the premature activation of the ejection mechnism, or alternatively, that Moyer's negligence contributed proximately to causing the fatal accident. These affirmative defenses were based upon the pilot's alleged deviation from his flight manual by pulling the initiator pins before he had entered the pilot's seat and by holding out the spring-loaded pin while raising the right armrest.

The United States answered by denial of the complaint's charges as to negligence on its part, and by asserting that the complaint failed to state a claim upon which relief could be granted. The answer also asserted that the district court was without jurisdiction because the complaint did not set forth a claim for which the United States, if a private person, would be liable in accordance with the law of the place where the alleged negligence occurred; and finally that the negligence of plaintiff's decedent was the sole proximate cause of the accident.

Aircraft answered by denying any negligence on its part of the design or manufacture of the ejection seat. Aircraft further alleged that between the time it manufactured and sold the seat and the time of the accident, the seat had been disassembled, serviced and

---

7. This allegation was rejected by the district court on the merits. See note 6, supra.

modified to meet revised specifications of the United States Government. As did its co-defendants, Aircraft alleged that the negligence of the pilot proximately caused or contributed to causing the fatal accident. In addition, Aircraft asserted that the roll pin had been designed and manufactured as an integral safety aspect of the ejection seat system and installed in such a manner that it was virtually unremovable, pointing out in this respect that Bass was required to use a great deal of force in order to remove the roll pin from the ejection seat assembly.

### THE MOTIONS FOR SUMMARY JUDGMENT

Martin and Aircraft moved for summary judgment on the ground that no material issue of fact with respect to the issue of proximate causation existed for jury determination. U.S. District Judge Eaton denied the motions on April 10, 1968. Concerning Martin's motion for summary judgment, Judge Eaton's order stated:

"The factual record in this case presents proximate cause issues to be decided by a jury. See General Dynamics Corp. v. Adams, 340 F.2d 271 (1965) and Cone v. Inter County Tel. & Tel. Co., 40 So.2d 148 (Fla., 1949) re: 'foreseeability'."

In disposing of Aircraft's motion, he observed:

"Aircraft's answer raises two defenses of intervention in the chain of causation: first, that the original design was changed, since the ejection seat was modified after it was sold; second, that when the seat was sold, the roll pin was in place and the removal of the roll pin by Airmotive's employee was an independent intervening force which operates to relieve Aircraft of liability. Substantial proximate cause issues remain to be decided by a jury."

### THE DIRECTED VERDICTS FOR THE CORPORATE DEFENDANTS

Prior to trial, the jury empaneled for the corporate defendants was accepted by the United States as an advisory jury pursuant to Rule 39(c), Federal Rules of Civil Procedure.[8] In the trial before a visiting judge, Senior Judge Layton, the presentation of the plaintiff's case in chief required more than two weeks. When the plaintiff rested initially the trial judge directed a verdict for the two corporate defendants, noting, as we set forth supra, note 3 that:

". . . on the question of intervening cause and weighing the facts of this case against the Florida law, I am of the view the convergence of a number of distinctly unusual and unrelated factors as necessary to the happening of this accident simply could not have been reasonably foreseen by either Martin Marietta or Aircraft Mechanics and were not happenings set in motion by the alleged negligence of the defendants."

### THE UNITED STATES' MOTION TO DISMISS

After the two corporate defendants were eliminated from the proceedings by the directed verdicts in their favor, the trial continued as to the United States. The advisory jury found (as noted above) that the United States was negligent in delivering the aircraft to American Airmotive when it knew or should have known that the ejection seat had been improperly designed and manufactured and in the preparation and issuance of Technical Order No. 1B–57–876. In addition, the advisory jury found a

---

8. Section 2402, Title 28, United States Code provides:

"Any action against the United States under section 1346 shall be tried by the court without a jury, except that any action against the United States under section 1346(a)(1) shall, at the request of either party to such action, be tried by the court with a jury." The exception is inapplicable, since Sec. 1346(a)(1) deals with suits for tax refund.

proximate causal relationship ("legal cause") between the United States' negligence and the death of Larry Eugene Moyer and an absence of contributory negligence on the decedent's part. It assessed plaintiff's damages at $700,000.-00.

The United States thereafter filed a motion to dismiss for lack of jurisdiction, relying upon the "discretionary function" exception to the Federal Tort Claims Act, 28 U.S.C. Sec. 2680(a) (Note 5, supra). In granting the motion, Judge Layton stated:

"The parties agree that critical to deciding whether particular acts of omissions by Government employees are protected by the 'discretionary function' exception is whether the acts or omissions occurred on a *planning* level or whether they occurred at the operational level. Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L. Ed. 1427 (1953). In the former case, the activities would be included within the purview of the discretionary function exception, and the plaintiff's claim would be barred. However, if the acts complained of occurred at the operational level, then the full effect of Sec. 1346(b) would apply and the Government would have to respond as would a private person in a similar position. Indian Towing Co., Inc. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, 1955; American Exchange Bank of Madison, Wis. v. United States, 257 F.2d 938, 78 A.L. R.2d 879 (7th Cir. 1958).

"As regards the selection of the B–57A type aircraft, and in particular the ejection seat and ejection mechanism to be employed in that aircraft, I find that these decisions reflect choices made on a planning level, which, in the most immediate sense, affect the political interests of the nation. These decisions, then, are protected by the 'discretionary function' exception defined in Sec. 2680(a)." 302 F.Supp. at 1237.

## THE RELATIONSHIP BETWEEN PROXIMATE AND INTERVENING CAUSES

A perceptive discussion of the relationship between the concepts of proximate cause and intervening cause appears in the Harper and James treatise on torts:

"By and large external forces will be regarded as intervening if they appear on the scene after defendant had acted unless perhaps their pending inevitability at the time of defendant's negligent act or omission is made crystal clear. And when a new force (for which defendant is not responsible) 'intervenes' in this crude sense to bring about a result that defendant's negligence would not otherwise have produced, defendant is generally held for that result only where the intervening force was foreseeable. As many cases put it, a new and unforeseeable force breaks the causal chain. A better analysis is to regard the intervening force as a risk or hazard and to ask whether its foreseeability was such as to make defendant's act negligent with regard to it. It is better, in other words, to inquire whether defendant's duty extends to such a risk as the intervening force, because the question in this form focuses attention on a more significant and less fictitious problem than that of cause." (The Law of Torts, Sec. 20.5(5), Vol. 2, pages 1142–3)

Florida Jurisprudence summarizes the relationship between the two concepts under Florida law in the following language:

"The rule that the causal connection between a person's negligence and an injury is broken by the intervention of a new, independent, and efficient intervening cause so that the negligence is not actionable is subject to the qualification that if an intervening cause was foreseen or reasonably might have been foreseen by the wrongdoer, his negligence may be con-

sidered the proximate cause of an injury, and he may be held liable, notwithstanding the intervening cause. That is, the intervention of independent intervening causes does not break causal connection if the intervention of such forces was itself probable or foreseeable." 23 Fla.Jur. Negligence, Sec. 39, page 282.

The Florida Supreme Court, on at least two occasions, has addressed itself to the foreseeability element of the proximate cause doctrine. In Cone v. Inter County Telephone and Telegraph Co., Fla., 1949, 40 So.2d 148, the plaintiff telephone company brought suit to recover payments made to one of its employees who had been injured by exploding gasoline. The defendant's truck had been negligently operated on a public highway, thereby causing an accident with another vehicle which disrupted a nearby telephone pole and attached lines. The plaintiff's employee was sent out to repair the damage and was injured when gasoline from the defendant's truck exploded. In finding for the defendant, the Florida Supreme Court made the following observations with respect to the foreseeability aspect of the proximate cause doctrine:

"Not every negligent act of omission or commission gives rise to a cause of action for injuries sustained by another. It is only when injury to a person who himself is without contributing fault has resulted directly and in ordinary natural sequence from a negligent act without the intervention of any independent efficient cause, or is such as ordinarily and naturally should have been regarded as a probable, not a mere possible, result of the negligent act, that such injured person is entitled to recover damages as compensation for his loss. Conversely, when the loss is not a direct result of the negligent act complained of, or does not follow in natural ordinary sequence from such act but is merely a possible, as distinguished from a natural and probable result of the negligence, recovery will not be allowed.

Seaboard Air Line Ry. Co. v. Mullin, 70 Fla. 450, 70 So. 467, L.R.A.1916D, 982, Ann.Cas.1918A, 576. 'Natural and probable' consequences are those which a person by prudent human foresight can be expected to anticipate as likely to result from such an act, because they happen so frequently from the commission of such an act that in the field of human experience they may be expected to happen again. 'Possible' consequences are those which happen so infrequently from the commission of a particular act, that in the field of human experience they are not expected as likely to happen again from the commission of the same act." 40 So.2d at 149.

The quoted language from *Cone* was clarified by the Florida Supreme Court's subsequent opinion in Pinkerton-Hays Lumber Company, Inc. v. Pope, 1961, 127 So.2d 441. There the Court concluded that an intermediate appellate court had incorrectly interpreted the *Cone* test:

"The error into which the District Court fell was the *subjective* application of the *objective* test of foreseeability as pronounced in the *Cone* case. The language in question was intended to convey the notion that foreseeability depends in part on whether the *type* of negligent act involved in a particular case has so frequently previously resulted in the *same type* of injury or harm that 'in the field of human experience' the same *type* of result may be expected again. The test was not intended to, nor do we think it does, imply that a plaintiff, in order to recover in a negligence action, must prove that the *particular* causative act had frequently occurred before, and that it had frequently resulted in the same *particular* injury to the plaintiff." 127 So. 2d at 442–443. (Emphasis in original)

■ The fact that the so-called "intervening" cause itself constitutes negligence may not necessarily relieve a defendant from liability for his own negli-

gent conduct. See the following statement in the Restatement of Torts, Second, Volume Two, Section 447, page 478:

"The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if

(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

Section 449 of the Restatement of Torts, Second, Volume Two, page 482, makes the following point in this regard:

"If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act, whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby."

### THE ROLE OF THE JURY IN PROXIMATE CAUSE DETERMINATIONS

It is a settled principle of Florida law that the issue of proximate causation is a factual question and ordinarily one for jury determination. Florida Jurisprudence comments:

"The general rule is that the proximate cause of an injury is ordinarily a question for the jury, the court instructing them on what the law requires to constitute it, the jury applying the law to the facts. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it. Thus, unless the minds of reasonable men could not differ as to the cause of an injury, the problem of determining the existence of proximate cause is one for the jury. However, where the facts are susceptible of only one inference, the question is one of law for the court and the court should withdraw the question from the jury." (23 Fla.Jur. Negligence, Sec. 133, pages 358–9)

See also, for example, Weber v. Porco, Fla.1958, 100 So.2d 146; Grove v. Sanford Mobile Park, Inc., Fla.App. 4 1968, 212 So.2d 34.

The Restatement of Torts discusses the role of the jury in this area in a manner consistent with Florida law:

"If the facts are undisputed, it is usually the duty of the court to apply to them any rule which determines the existence or extent of the negligent actor's liability. If, however, the negligent character of the third person's intervening act or the reasonable foreseeability of its being done (see Sec. 447 and 448) is a factor in determining whether the intervening act relieves the actor from liability for his antecedent negligence, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was negligent or foreseeable, the question should be left to the jury." (Comment b, Sec. 453, Restatement of Torts, Second, Volume Two, page 491.)

In evaluating the propriety of the district court's direction of verdicts for the corporate defendants in this case, we find particularly persuasive our own opinion in General Dynamics Corporation v. Adams, 5 Cir., 1965, 340 F.2d 271. There a heavy equipment mechanic, the decedent Adams, employed by Pan American World Airways at the Cape Kennedy, Florida, missile base, was assigned to work on an elevator in a tower constructed by the defendant, General Dynamics Corporation. To accomplish the work, it was necessary for

the repairman to get on top of the elevator itself. Through an oversight, the elevator was not deactivated prior to the repairman's ascension to the roof of the car. Although a general announcement may have been made to all personnel in the area not to use the elevator on which repairs were being made, an employee of General Dynamics absentmindedly entered the elevator and caused it to rise. The repairman was knocked off the elevator and fell to his death. Suit was brought by the repairman's widow against General Dynamics for wrongful death on the theory that the elevator had been negligently designed and constructed in that two safety features mandated by Florida statutory law, which would have prevented the death of the repairman, had not been incorporated into the elevator: a door in the roof of the elevator through which the repairman would have been able to go in the event of an emergency and a switch mounted on the roof of the elevator which would have enabled the repairman to halt the upward motion of the car. In holding for this Court that a jury question of proximate causation had been raised by the plaintiff's evidence, and applying Florida law, Chief Judge Tuttle observed:

> "We have no doubt that a jury question was posed by the evidence presented by appellee. If the adoption of the statute dealing with safety in elevator construction, which by reference to standards universally understood required the installation of these particular safety devices, was not of itself adequate proof of the foreseeability of injury similar to the actual occurrence which resulted in Adams' death, the statute coupled with the other facts proved at the trial, surely were. Testimony showing the inadequacies inherent in the operation when these safety regulations had not been complied with, and showing the casual attitude of all persons involved towards the inadequate safety measures that were in effect, would permit the jury to infer that an accident

like that occurring to Adams is exactly the eventuality that the legislature had in mind when it required the installation of these two devices. Thus, we conclude that the trial court did not err in submitting this issue to the jury." 340 F.2d at 275–276.

■ Under both the Florida law and the test articulated by this Court, en banc, in Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365, 374–375, we conclude that the trial court committed error in directing verdicts for the corporate defendants at the close of the plaintiff's evidence. There was sufficient evidence for the jury to determine whether the aircraft and the ejection seat system had been negligently designed and manufactured, and there was sufficient evidence also for the jury to determine whether the fatal accident of April 22, 1964, was a type of accident reasonably foreseeable at the time the aircraft and ejection seat were designed and manufactured. In remanding this case for another trial we do not intimate any opinion as to the plaintiff's chances of ultimate success. We hold only that the trial court should not have directed verdicts for the corporate defendants. The issues of negligence and contributory negligence, foreseeability and proximate cause were jury issues.

## THE DISCRETIONARY FUNCTION EXCEPTION

The starting point for analysis in every case in which the United States seeks to defend on the basis of the discretionary function exception to the Federal Tort Claims Act must be the Supreme Court's opinion in Dalehite v. United States, 1953, 346 U.S. 15, 73 S. Ct. 956, 97 L.Ed. 1427. *Dalehite* relieved the United States of all liability for its actions leading up to and during the April, 1947, disaster at Texas City, Texas, involving the explosions of fertilizers stored for shipment overseas as part of this country's post-war foreign aid program. In defining the concept of discretionary function, the Supreme

Court, speaking through Mr. Justice Reed, stated:

"It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of Sec. 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion." (346 U.S. at 35–36, 73 S.Ct. at 968, 97 L.Ed., at 1440)

This expansive definition of "discretionary function" was applied in *Dalehite* to every aspect of the United States Government's involvement in the Texas City tragedy. From the Cabinet-level decisions to ship fertilizer to the distressed areas of Europe and Asia to the manner in which the bags of fertilizer were labeled, the Supreme Court found the exercise of discretion. The result in *Dalehite* received much critical comment.[9] An intense ongoing debate has developed as to whether *Dalehite* has been undermined by subsequent decisions of the Supreme Court.

Indian Towing Company v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, involved an action under the FTCA for damages sustained when a tug went aground with resultant damage to its barge cargo because of the allegedly negligent operation of a light-house by the United States Coast Guard. The opinion by Mr. Justice Frankfurter by a five to four majority held that the Coast Guard, having undertaken to provide lighthouse service, had a duty to use due care to make certain that the lighthouse was kept in good working order and to discover the light's failure and to repair it or give warning that it was not operative. The breach of these duties, if it caused damage, was deemed actionable under the FTCA. The Court was careful to note, however:

"The Government concedes that the exception of Section 2680 relieving it from liability for negligent 'exercise of judgment' (which is the way the Government paraphrases a 'discretionary function' in Sec. 2680(a)) is not involved here, and it does not deny that the Federal Tort Claims Act does provide for liability in some situations on the 'operational level' of its activity." 350 U.S. at 64, 76 S.Ct. at 124, 100 L.Ed. at 53.

In Hatahley v. United States, 1956, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 suit was brought under the FTCA by Indians for damages resulting from the appropriation and sale or destruction of the Indians' horses by federal range agents purporting to act under local law pursuant to instructions contained in the Federal Range Code. The Court, speaking through Mr. Justice Clark, held that because the Utah abandoned horse statute required the giving of written notice to the apparent owners of horses as a condition precedent to their impoundment, the actions of the federal agents, which had been undertaken without written notices to the plaintiffs, were unlawful and gave rise to a cause of action against the United States under the FTCA. Addressing itself to the discretionary function exception's applicability, the Court stated:

"Nor can the second portion of (a) exempt the Government from liability. We are here not concerned with any

---

9. See Reynolds, *The Discretionary Function Exception of the Federal Tort Claims Act*, 57 Georgetown Law Journal 81, 93–98 (1968).

problem of a 'discretionary function' under the Act, see Dalehite v. United States, supra. These acts were wrongful trespasses not involving discretion on the part of the agents, and they do give rise to a claim compensable under the Federal Tort Claims Act." 351 U.S. at 181, 76 S.Ct. at 752, 100 L.Ed. at 1074.

*Hatahley* was closely followed by Rayonier, Inc. v. United States, 1957, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354. Rayonier was an action under the FTCA for losses sustained by landowners allegedly as the result of the negligence of federal employees in permitting a forest fire to originate on federal land and in failing to act with due care in putting the fire out. The Supreme Court, in an opinion by Mr. Justice Black, held that under the Federal Tort Claims Act the United States would be liable to the plaintiffs for losses sustained by reason of the United States Forest Service's negligence in fighting a forest fire if, as alleged in the complaint, the law of the State of Washington would impose liability on private persons or corporations under similar circumstances. Although the Government in *Rayonier* did not assert the defense of discretionary function, it did rely upon that portion of the *Dalehite* decision which held that the Tort Claims Act had not altered the usual rule that an alleged failure of public firefighting forces to properly perform their duties does not create private actionable rights.

*Rayonier* also made clear that the liability of the United States in tort is not restricted by concepts imported from the law of municipal corporations of a distinction between negligence in performing acts in the government's "proprietary" capacity and negligence when it acts in a "uniquely governmental" capacity, saying, at 352 U.S. 319, 77 S.Ct. 376–377, 1 L.Ed. 356, that *Indian Towing* necessarily rejected anything to the contrary in *Dalehite*.

The United States, as expected, takes the position that the Supreme Court decisions following *Dalehite* did not alter the *Dalehite* conception of the scope of the discretionary function exception of 28 U.S.C. 2680(a). It relies upon the following language in Blaber v. United States, 2 Cir., 1964, 332 F.2d 629:

"Plaintiffs suggest that the *Dalehite* case has been weakened by subsequent developments, particularly Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, and Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354. These cases did enlarge the scope of the United States' liability as it might have been thought to exist after *Dalehite*, but they did not affect the scope of the discretionary function immunity. *Indian Towing* concededly involved negligence at only an operational level, 350 U.S. at p. 64, 76 S.Ct. 122, and *Rayonier* overruled *Dalehite* to the extent of allowing recovery where negligence in fire fighting could be shown. The kind of negligence, not the kind of activity pursued, became the test for determining the liability of the United States." 332 F.2d at 631.

Judge Goldberg, a member of this Court, in Smith v. United States, 5 Cir. 1967, 375 F.2d 243, cert. denied 1967, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106, met the government's citation in that case of this quote from *Blaber* with the following analysis, which carries convincing weight:

"The description of a discretionary function in *Dalehite* permits the interpretation that any federal official vested with decision-making power is thereby invested with sufficient discretion for the government to withstand suit when those decisions go awry. Most conscious acts of any person whether he works for the government or not, involve choice. Unless government officials (at no matter what echelon) make their choices by flipping coins, their acts involve discretion in making decisions.

If the Tort Claims Act is to have the corpuscular vitality to cover anything

more than automobile accidents in which government officials were driving, the federal courts must reject an absolutist interpretation of *Dalehite,* and that interpretation is rejected by *Indian Towing* and especially by *Rayonier.* In the latter case, the Court held that the government could be liable for substandard firefighting by the Forest Service. The facts of the case make it clear that the negligence lay in part in the decision to withdraw the major part of the fire fighting force before the blaze was truly extinguished. This is perhaps a minor decision when compared to some made in the government, but it is a decision nonetheless, made by an official exercising some discretion. Cases under the Act therefore put courts to the question of what sorts of decisions can be classified as resulting from discretion within the meaning of Sec. 2680(a). It is not a sufficient defense for the government merely to point out that some decision-making power was exercised by the official whose act was questioned. Answering these questions, a difficult process, is not aided by the importation of the planning stage–operational stage standard as argued for by Smith. Such a distinction is specious. It may be a makeweight in easy cases where of course it is not needed, but in difficult cases it proves to be another example of a distinction 'so fine-spun and capricious as to be almost incapable of being held in the mind for adequate formulation.' Mr. Justice Frankfurter for the Court in *Indian Towing,* supra, 350 U.S. at 68, 76 S. Ct. at 126, 100 L.Ed. at 55. Such non-statutory 'aids' to construction tend to obscure, to limit, or even to replace the standards whose meaning they are supposed to clarify. It must be remembered that the question at hand here is the nature and quality of discretion involved in the acts complained of." (Citations omitted.) 375 F.2d at 246.

## THE DISCRETIONARY FUNCTION EXCEPTION AS APPLIED TO THIS CASE

In seeking reversal of the district court's dismissal of her suit against the United States because of the bar of the discretionary function exception, the plaintiff argues in her brief:

"It seems clear that this resolution of the issue was incorrect. While the selection and the choice of the type of aircraft and perhaps even the general design of the seat in question, may have involved a 'discretionary function' reflecting a decision on the 'political interests' of the country, this surely cannot be said of the negligence involved in permitting the design defects involved in this case to exist. Surely, the 'choice', if any such choice was made, as to whether the roll pin should be at the bottom or top of the telescoping armrest, whether it should be non-removable, the strength of the spring-loaded pin or the design of the linkage between the armrest and the ejection system—can in no measure be deemed a 'discretionary function' under the statute." (Plaintiff-appellant's brief, p. 27)

The United States in reply argues that in addition to the clearly discretionary authority of the Secretary of the Air Force to purchase and select aircraft for military use, his discretionary authority extends to decisions involved in the design of the aircraft themselves:

"The decision to procure a particular plane does not exhaust the Secretary's discretion, for he is later faced with the decision whether to accept the plane produced by the manufacturer under the procurement contract. Where, as here, this decision involves an evaluation of the safety of a component of the plane, it entails weighing the relative safety of the component, the degree of risk involved in its utilization, and the cost of securing a change in the component to make it 'more safe'. That cost, of course, is

measured not only in money, but also in terms of both the adverse affect which delay may have upon the goals sought to be obtained by use of the plane and the effect which the change may have on the ability of the component to continue to perform the function for which it is designed." (Brief of the United States, page 19–20)

The United States goes on to assert that:

"Acceptance of that 'appellant's' argument in this case would bring up for review, and require justification of, every minute aspect of procurement decisions, thus completely destroying the freedom of judgment—which as we have seen is vital to the effective exercise of functions directly affecting the nation's political interests—which must be afforded to procurement decisions in the military sphere." (Brief of the United States, page 20)

■ We have difficulty applying the decided cases as to negligence in exercise of a discretionary function to the facts presented here. The facts in this case bring it very close to the line separating actions covered by the FTCA and those beyond its reach because governed by the discretionary function exception. Without the gloss of later cases *Dalehite* would preclude recovery. We agree with the United States that the selection of the B–57 aircraft by the Secretary of the Air Force constituted the exercise of a discretionary function. Equally the determination of the number of such aircraft to be purchased by the Department of the Air Force also constituted the exercise of a discretionary function. But, coming down to the acceptance of a system of the aircraft, such as the pilot's ejection seat and its mechanism, which, if negligently designed or constructed posed a safety hazard to an individual operating the aircraft, we hold that the discretionary function exception's sweep falls short of immunizing the United States from liability.

Though our decision may result in this case in the United States eventually being required to compensate the plaintiff for the death of her husband, it should not significantly increase the exposure of the United States to suit under the Federal Tort Claims Act. In Feres v. United States, 1950, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, the Court held that the Federal Tort Claims Act does not extend its remedy to members of the United States' armed forces who sustain, incident to their service, what otherwise would be actionable wrongs. Section 8116(c), Title 5, United States Code, provides that the Federal Employees' Compensation Act is the exclusive avenue for compensation of civilian employees of the United States who suffer employment-connected injuries. See also, Section 8173, Title 5, United States Code, with respect to employees of non-appropriated fund instrumentalities of the United States. Ordinarily then employees of the United States, either military or civilian exposed to hazards caused by defective systems of an aircraft such as the B–57 would not be eligible for compensation under the Tort Claims Act. This plaintiff-appellant's decedent, Larry Eugene Moyer, as a test pilot employed by Airmotive, was a member of a small group statistically.

### PROCEEDINGS UPON REMAND

The plaintiff is entitled to jury trial anew with respect to the two corporate defendants, a trial which will not result in a directed verdict for the corporate defendants at the conclusion of the plaintiff's evidence, assuming that she again produces evidence comparable to that at the first trial. Because the district court did not reach the merits of the plaintiff's claim against the United States as to design negligence the plaintiff is to be afforded a new trial as to that issue.

Reversed and remanded.

CLARK, Circuit Judge (dissenting in part and concurring in part):

I respectfully dissent from that portion of Judge Simpson's opinion which reverses the verdicts for Martin and Aircraft. The majority's statement of the governing principles of law is both accurate and precise. My problem relates solely to the application of those conventional principles to the acknowledged, uncontested facts of this cause. Certainly cases sounding in negligence rarely lend themselves to directed verdicts—but they are not privileged to enjoy a total immunity from Rule 50. Because the proof in this record failed to show any connection whatsoever between the 1954 actions of Martin and Aircraft and test pilot Moyer's death ten years later, I would affirm the trial court's dismissal of these parties.

Four grounds of negligence were asserted against these private corporate parties. (1) A spring-loaded safety pin was too weak. The proof failed to demonstrate any weakness in this pin and spring assembly, rather, as the majority points out, the evidence demonstrated that Moyer deliberately held the pin out of its normal position while operating the seat arm. (2) The ejection mechanism was placed in the right-hand rather than the left-hand armrest. This was a design requirement of the United States. The private parties had no control over or responsibility for this feature.[1] (3)

The initiator pins (also called safety pins), which were the primary safety devices for this mechanism, were not identified by streamers. Moyer's pilot instruction sheet contained the following bold print notice:

[A7608]

**Do not remove seat safety pins until after armrest has been raised to the flight position. Inadvertent firing of the pilot's ejection seat could result when raising the armrest.**

His actions were further governed by a requirement that he remove the pins only *after* setting and locking the armrest and that he then display the pins to the ground crew. To say that any competent test pilot could have regarded these pins as insignificant is either incredible or ridiculous or both. (4) A part called a roll pin was removable and was not adequately marked as a safety device. The only ground warranting discussion is (4)—the roll pin.[2]

Under the heading "Undisputed Facts" the majority could have included the following additional items of proof which are equally uncontroverted.

The specifications which controlled the design and manufacture of this seat

1. Plaintiff's expert witness was also critical of integrating the ejection firing mechanism into a movable armrest. This feature was also wholly dictated by the specifications developed by the United States.

2. With the hope that a picture can be worth a thousand words, stylistic representations of the seat with the armrest mechanism in its normal up and down positions are set out below:

Down position for entry     Up position for flight

① Trigger          ④ Spring-loaded pin

② Explosive charge    ⑤ Roll pin

③ Initiator (safety) pins   ⑥ Retaining ring

[A7607]

were promulgated by the United States in January 1952. The particular plane, together with the seat here involved, was delivered to the United States in July 1954 and was under the exclusive control of the United States after that date. The seat was an integral part of a highly dangerous instrumentality designed for use only by uniquely trained, qualified personnel.

From 1952 when this plane was designed by the United States to the date of Moyer's death there had never been an accidental ejection from this type of plane either on the ground or in flight and there had never been an accident of any kind traceable to the removal of a roll pin.

If the roll pin had been strong enough to have stopped the armrest support tube in the final ¼ inch of its travel, such stoppage would have prevented the firing of the ejection charges because it would have kept Moyer from jerking the entire armrest support tube out of its socket. However, this secondary safety function of the roll pin does not create any jury issue in this case because it was never designed or intended to be removable in any proper sense of that term. It was a *permanently* installed part of the seat arm. When the mechanic, Bass, in attempting to carry out the modification the government had decided to make without the participation or approval of Martin and Aircraft, erroneously determined to remove this roll pin (to correct an earlier mistake he had made) the majority says he had to use "considerable force". "Considerable" seems a clear understatement to me. Bass had to utilize a set of vise grip pliers and a hammer to enable him to bring 350–400 pounds of pressure to bear in order to wrench the pin out of the tube. To compound Bass' multiple errors, the final inspection called for by the modification contract negligently failed to detect his omission to reinstall the roll pin. Ironically, the roll pin had nothing to do with the modification required by the United States, nor did it have anything to do with correcting the initial error made by Bass in trying to carry out the modification work. Moreover, the top end of the tube assembly as designed and constructed by Martin and Aircraft had easily removable retaining rings which should have been used—if it ever became necessary to remove the tube assembly. Reducing the precision of aviation mechanics to work-a-day terms, this tragedy of errors can be likened to a laborer who, thinking he must reach the other side of a brick wall to do his job, takes a sledge hammer and knocks a hole in the wall instead of using a door—only to be followed by a building inspector who fails to notice the hole.

I think it must be conceded that no mechanism could ever be made fool proof. For example, if the tube in question had been designed with a flared end or with a welded collar instead of the roll pin, a mechanic as determined as Bass could have cut it off with a hack saw or welding torch. In any event, the crucial and unassailable fact is that this roll pin was never intended to be a removable part. That Bass was able to strong-arm it out doesn't make it so.

Whether the issue be cast as one to determine original negligence unbroken by intervening cause, or contributory negligence, or proximate cause, or forseeability, I can't find anything in the proof developed in this case for a jury to act on. This kind of failure-of-proof situation is the raison d'etre for the rule permitting a judge to direct verdicts in jury cases. I would not fault its application to Martin and Aircraft here.

I concur in that portion of Judge Simpson's opinion which requires the court to reach the merits of the plaintiff's claim against the United States.