Mary Jean **MURRAY** et al., and Nancy Jeanne M. Droubay et al., Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

Civ. No. C–270–70.

United States District Court,
D. Utah, C. D.

June 1, 1971.

Clifford L. Ashton and Richard A. Giauque, Salt Lake City, Utah, and Ken Chamberlain, Richfield, Utah, for plaintiffs.

C. Nelson Day, U. S. Atty., Salt Lake City, Utah, and Philip Silverman, Department of Justice, Washington, D. C., and Neil Eisner, Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RITTER, Chief Judge.

This case came on for trial before the court commencing May 4, 1971, and the court having heard the evidence of the parties and having heard the arguments of counsel, now makes and enters its

## FINDINGS OF FACT

1. The defendant United States of America, through its agency the Federal Aviation Administration, was the operator of a government Flight Service Station at the Bryce Canyon, Utah Airport on November 8, 1969, the date of the air crash out of which these actions arose.

2. On that date, a single-engine aircraft piloted by Don C. Kelley and carrying passengers Joe W. Murray and John Richard Droubay, left Escalante, Utah at approximately 9:00 a. m. (MST), destined for Salt Lake City or Provo, Utah.

3. The pilot, Don C. Kelley, was a certified pilot with approximately 1600 hours of recorded flying time. The passenger Joe W. Murray was a Senior Drilling Engineer for Tenneco Oil Company, and was working on job sites in the Bryce Canyon area. The other passenger, John Richard Droubay, was the owner and operator of a motel and certain ranch properties near Escalante, Utah.

4. Some time between 5:30 p. m. and 6:00 p. m. (MST) on November 8, 1969, the craft, with the same pilot and passengers, departed the Provo airport heading in a southerly direction.

5. The Kelley aircraft was a Cessna 206, which has a cruising speed of 150 to 160 miles per hour and the distance from Provo, Utah to Bryce Canyon, Utah is approximately 170 statute miles. The subject aircraft arrived in the Bryce Canyon, Utah area some time shortly before 7:00 p. m. (MST) on the night of November 8, 1969. When the plane arrived at the Bryce Canyon Airport that night, there were no runway lights on.

6. The Bryce Canyon, Utah Airport is attended by FAA employees seven days a week, 24 hours a day; the airport is open to the general public and no two-way radio is required.

7. The government's Flight Service Station at Bryce Canyon, Utah is located adjacent to a 7400-foot emergency runway. The field is equipped with a rotating beacon light and runway boundary lights which run the entire length of the runway on both sides. The switch for the runway boundary lights is in the Flight Service Station and within easy reach of the person on duty in the operations room at the station. The station is so situated that the operating quarters afford a good view from inside of the runway boundary lights when those lights are in operation.

8. The FAA Facility Management Manual provides in its section on "Airport Lighting" that the airport lights shall be operated by the Flight Service Station when the controls for those lights are extended into the station, are located conveniently to the operating position, and the operating quarters are so situated as to allow the operator, without leaving his post of duty, to determine if the lights are in operation.

9. The Flight Service Station at Bryce Canyon contains extensive teletype

equipment for receiving and transmitting weather and other pertinent aeronautical information. The windows of the station are sealed shut during winter months and the walls and ceiling of the operations room are covered by acoustical tile. Certain pieces of the teletype equipment in the operations room operate continuously, and give off a loud "clacking" noise.

10. The noise of this equipment, the sealed windows and the acoustical tiling make it difficult for one on duty inside the operating quarters of the Flight Service Station at Bryce Canyon to hear the noise of aircraft outside.

11. It is elementary that a night-flying pilot either without a radio or with a radio that has gone dead, must, in the event he approaches an airport at which the runway lights are not on, circle the field in order to get those lights turned on. This means of requesting runway lights at night was recognized in various government publications to airmen and was acknowledged by those who testified as a customary practice among airmen.

12. On the night of November 8, 1969, the Kelley aircraft entered the Bryce Canyon area from the north or northwest and made several passes over the government Flight Service Station. On its first pass the craft, heading south, flew over or close to the Flight Service Station, made a left turn and flew over the Pink Cliffs Motel (which is located approximately three-fourths of a mile southeast of the Flight Service Station). It then proceeded at a low altitude in a northeasterly direction, made another left turn and came from north to south down the runway area, past the Flight Service Station, again at a low altitude. This time the craft passed directly over the FAA housing complex (which is located approximately one mile south of the Flight Service Station). When the plane passed over the FAA housing complex, it then made a steep right turn and lined up parallel to the runway, heading north. The airplane was seen blinking its landing lights and a tail light

several times during the course of these maneuvers.

13. Gordon Reier, an off-duty FAA employee who was at the FAA housing complex when the plane passed over the complex, saw the plane circling and blinking its lights, and he noticed that the runway lights were not on at the airport. He then rushed into his house, located approximately 100 yards from where he was when he first observed the aircraft, and telephoned Stephen Lynch, the FAA Air Traffic Control Specialist on duty at the Flight Service Station, to tell him to get the lights on. When Reier went outside, after making this phone call, the runway lights were on. Neither of these government employees saw or heard from the plane again that night.

14. The aircraft, on the last pass observed by anyone, proceeded north past the Flight Service Station at a low altitude and made another turn which brought it directly over the Flight Service Station again, this time heading west at an obviously roof-top altitude. When the craft was some 1500 feet west of the station, some part of it hit the ground and the craft broke into pieces, instantly killing all aboard.

15. At about 7:30 p. m. that night, Reier went over to the Flight Service Station to discuss the incident with Lynch. The runway boundary lights were on at that time and remained on for a period of about four or five hours. Neither of these employees notified anyone that night of the incident, and although each gave the accident investigator a written statement on the matter, Lynch neglected to include in his statement any mention of the telephone call he had received from Reier, suggesting that the runway lights be turned on to aid the circling plane in landing at the field.

16. From the time it arrived in the Bryce Canyon area on the night of November 8, 1969, until the time it crashed, the Kelley craft made a number of passes over the government Flight

Service Station in an attempt to get the attention of the government employee on duty, and to thereby get the runway boundary lights turned on. The craft was in the air circling or buzzing the field that night for at least ten minutes and perhaps a considerably longer period.

17. Lynch testified that from approximately ten minutes before the hour of 7:00 p. m. until some ten minutes after the hour, he was carrying out weather data duties. The government's Flight Service handbook in effect on the date of this accident expressly provides that the duties of the Flight Service Station operator with respect to weather observation are secondary and that the operator's prime function is flight assistance.

18. The same Flight Service handbook further provides that FAA employees are to provide maximum assistance to "aircraft in distress". While the government attempted to establish that the Kelley aircraft was without radio communications the night of November 8, 1969, such evidence, if accepted, would only establish that the plane was in distress, thus calling on the government employees to be particularly attentive to the peril presented and to their duty to provide maximum assistance to the imperiled pilot and passengers.

19. The weather conditions prevailing at the time this accident occurred were scattered clouds at 3,000 feet, visibility at least 15 miles, temperature 34° and the surface wind was calm. The night was very dark at the time this accident occurred.

20. A search was commenced late in the morning of November 9, 1969 when the plane was reported missing, and the wreckage was located at approximately 2:30 p. m. on the afternoon of the same day.

21. The wreckage was located about three-fourths of a mile west of the Flight Service Station and was strewn over a wide area. The wreckage was strewn in a westerly direction from the Flight Service Station. A watch found in the wreckage had stopped at 7:12 and sunset on the night involved was at 5:23 p. m. MST.

22. The FAA's own investigation of the air crash failed to disclose any evidence of any malfunction of the aircraft prior to impact, and an autopsy on the pilot's body was negative, indicating no intoxication.

23. The U. S. Government Flight Information Publication "Enroute Low Altitude U. S.", which was in effect on the date of this accident, indicated that the Bryce Canyon Airport had a Flight Service Station and that it had available runway lighting at night. This map indicated that an "L" with an asterisk meant that such runway lighting was available only on prior request. However, the information it contained for the Bryce Canyon Airport was a plain "L" with no asterisk.

24. Another government-published aeronautical map applicable to the Bryce Canyon area and in effect on the date of this accident, indicated that where lights were available and there was no asterisk, the lights would be on from sunset to sunrise, or could be obtained by request, either by radio or "by circling the field".

25. The FAA Facility Management Manual expressly provides that the facility chief of each FAA Flight Service Station has a duty to review the data shown for his facility on aeronautical maps, etc. and to take the necessary steps to make certain that the information published with respect thereto is accurate, complete and current.

26. The lighting information published by the government regarding the Bryce Canyon Airport was false, or at the very least, dangerously misleading.

27. The pilot Kelley had, at the time of the accident, been carrying in his plane numerous government aeronautical maps. The complete destruction of the craft and its contents made it impossible, however, to recover any of these maps in whole.

28. Joe W. Murray was a Senior Drilling Engineer with Tenneco Oil Company

and was 33 years old at the time of this air crash. He is survived by his wife, Mary Jean Murray, age 29, and his three children, Randall Lawrence Murray, a son age 8; Jean Ann Murray, a daughter age 7; and David Charles Murray, a son age 4, all of whom reside in Farmington, New Mexico. Each of these survivors of Joe W. Murray is a plaintiff in this action.

29. Murray had a steadily increasing income in the years immediately prior to his death, and was making approximately $16,000 a year at the time of his death. He had an excellent advancement potential with his employer, Tenneco Oil Company. An official of Tenneco testified that Murray had an assured future with the company, and that based upon his past employment record and the company's advancement policy, Murray would have received steady income advances to an annual compensation of approximately $23,000 by 1975, and similar steady income advances thereafter to an annual compensation at age 65 of at least $26,000 per year. At that time he would be entitled to at least $10,800 per year in retirement income until his natural death.

30. The evidence indicates that Joe W. Murray used approximately ten per cent (10%) of his earnings for his personal needs such as food, clothing, transportation and recreation.

31. Joe W. Murray had a close and loving relationship with his wife and with his children. The family engaged in numerous activities together, and Joe W. Murray was a constant and beneficial source of love, guidance and nurture to his wife and his children, which they have lost by reason of his death. His widow, Mary Jean Murray, has no prospect of an inheritance, other than that which could have been provided by her deceased husband.

32. John Richard Droubay was 37 years old at the time of his death, and, as previously indicated, was the owner and operator of a motel and certain ranch properties near Escalante, Utah. He is survived by his wife, Nancy Jeanne M.

Droubay, age 38, and his three children, Christine Estelle Droubay, a daughter age 18; Richard John Droubay, a son age 16; and Julie Ann Droubay, a daughter age 13, all of whom reside in Escalante, Utah. Each of these survivors of John Richard Droubay is a plaintiff in this action.

33. Prior to his acquisition of the specified properties in Escalante, Utah, Droubay had been employed in a sales capacity by Salt Lake Hardware Company, where he had a steadily increasing income and was earning between $11,000 and $12,000 per year when he left the company in 1963.

34. The uncontroverted evidence regarding the cash flow generated by Droubay's operation of the motel and ranch, and its capital value appreciation during the six year period he operated those properties (1963–1969), established that Droubay had the capacity to create an annual earning for his family of at least $16,500. His widow, Nancy Jeanne Droubay, testified that in her judgment, the family was living on a considerably higher economic standard during the six-year period her husband operated those properties, than in the previous period when he received a salary of $10,000 to $12,000 per year. While his widow is left with the motel and ranch property, she and the children have lost the source that created those assets and have lost the potential for the same creation of other income-producing assets and the possibility of a substantial inheritance from such continuing efforts by Droubay.

35. The evidence indicates that John Richard Droubay used approximately ten per cent (10%) of his earnings for his personal needs such as food, clothing, transportation and recreation.

36. John Richard Droubay also had a close and loving relationship with his wife and children and this family also participated together in numerous activities. Droubay provided a constant source of love, guidance and nurture to his wife and his children, which they have lost by reason of his death. His

widow, Nancy Jeanne M. Droubay, also has no prospect of an inheritance, other than that which could have been provided by her deceased husband.

37. Each of the decedents, Joe W. Murray and John Richard Droubay, was in excellent health, and neither had any infirmity which might have affected his future earning potential. Their widows testified that each provided valuable assistance and services in their respective households, by way of repair and maintenance and activities.

38. The funeral expenses in connection with the burial of Joe W. Murray were $1,306.40 and in connection with the burial of John Richard Droubay, were $1,162.04.

Based upon the foregoing Findings of Fact, the court hereby makes and enters its

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the subject matter of this action.

2. The employees of the defendant United States of America were under a duty, while engaged in the scope of their employment in the Flight Service Station at Bryce Canyon, Utah, to be observant to and listening for the sounds of aircraft circling the airport at night in an attempt to get the runway boundary lights turned on.

3. Employees of the defendant United States of America were careless and negligent in carrying out their duties and in otherwise operating the Bryce Canyon Airport Flight Service Station on the night of November 8, 1969.

4. Such carelessness and negligence on the part of the employees of the defendant United States proximately caused the subject air crash and the ensuing deaths of the pilot and the two passengers, Joe W. Murray and John Richard Droubay.

5. The defendant United States of America had a duty, in connection with its publication and dissemination of aeronautical charts and airport directory information, to truly and accurately represent the runway lighting available at Bryce Canyon, Utah, and the circumstances under which those lights would be on or would be turned on at night.

6. The defendant United States of America negligently published and disseminated certain aeronautical charts and other information which falsely indicated that either the runway lighting at Bryce Canyon was available throughout the night without request or that it was available to a night-flying pilot who circled the field as a means of requesting such lighting.

7. Such negligence on the part of the United States of America in publishing and disseminating false aeronautical information regarding the available runway lighting at Bryce Canyon, Utah was also a proximate cause of the subject air crash, and the ensuing deaths of the pilot and the two passengers, Joe W. Murray and John Richard Droubay.

8. Defendants' acts of negligence, as found hereinabove, did not arise out of the exercise of any discretionary functions within the meaning of 28 U.S.C. Section 2680(a).

9. Defendants' acts of negligence, as found hereinabove, did not constitute mere "misrepresentations" within the meaning of 28 U.S.C. Section 2680 (h).

10. The plaintiffs are entitled to recover from the defendant United States of America, such damages as they have suffered by reason of the wrongful deaths of Joe W. Murray and John Richard Droubay.

11. The plaintiffs are entitled, under applicable Utah law, to recover damages for their loss of financial support, loss of assistance and services to the family, loss of probability of an inheritance from the decedents, and for loss of society, companionship, happiness and association with their respective husbands and fathers. Furthermore, under Utah law, the children are entitled to recover for the loss of the nurture, guid-

ance and training they would have received from their father had he lived, and each survivor is entitled to recover for each of these elements of damage.

12. Based upon these elements of recovery for wrongful death under Utah law, the court has determined that the Murray plaintiffs are entitled to recover damages from the defendant United States of America in the aggregate amount of $470,275.40. In arriving at this figure, the court has determined:

(a) That, based upon the evidence received, Joe W. Murray had a life expectancy of 38.2 years, and that the present value of his future earnings and support is $413,030.00;

(b) That said amount should be reduced by ten per cent (10%) or $41,303.00 to reflect that amount which the decedent likely would have expended for his own living expenses;

(c) That because the defendant has strongly urged the court to reduce the future support figures by the amount of income tax applicable thereto, that factor has been taken into consideration, despite the fact that it is the court's view that this factor involves some speculation and need not necessarily be taken into account in such cases;

(d) That considering the decedent's expectable income and the number of exemptions he would be entitled to claim, and using the standard deduction, a reasonable percentage of the decedent's net future earnings subject to tax would be fifteen per cent (15%) thereof, or $55,758.00; and that therefore, the present value of Murray's after-tax net earnings and support is $315,969.00;

(e) That under applicable Utah law, said net amount of lost earnings and support should be distributed among the Murray plaintiffs on the basis of one-third thereof to the surviving spouse and the remainder in equal shares to the three surviving children; this provides the plaintiff Mary Jean Murray with $105,323.00 and each of the Murray children with $70,215.33, for this particular damage element;

(f) That to these figures there should be added the amount of $30,000.00 to the plaintiff Mary Jean Murray, for her loss of assistance and services, loss of probability of an inheritance and loss of her husband's society, companionship and association;

(g) That to these figures there should be added the amount of $50,000.00 to each of the surviving children of Joe W. Murray, for their respective loss of the nurture, guidance and training of their father;

(h) That there should be further added to the recovery of the plaintiff Mary Jean Murray, the amount of $1,306.40, the same being the amount of funeral expenses she paid in connection with the death of her husband; and

(i) That from the recovery of each of the respective Murray plaintiffs, the court should deduct his or her proportionate share of the $50,000.00 to be paid by the defendant Judy G. Kelley by way of pretrial settlement of the plaintiffs' claims against said defendant, consistent with Conclusion No. 17 below. The amount of said reduction for the plaintiff Mary Jean Murray is $7,350.00 (14.7%) and for each of the surviving Murray children, $6,550.00 (13.1%).

13. The damages recoverable by each of the Murray plaintiffs from the defendant United States of America, taking into consideration the various factors enumerated above, are as follows:

| | |
|---|---|
| Mary Jean Murray | $129,279.40 |
| Randall Lawrence Murray | 113,665.33 |
| Jean Ann Murray | 113,665.33 |
| David Charles Murray | 113,655.34 |

14. Based upon these elements of recovery for wrongful death under Utah law, the court has determined that the Droubay plaintiffs are entitled to recover damages from the defendant United States of America in the aggregate amount of $401,358.04. In arriving at this figure, the court has determined:

(a) That, based upon the evidence received, John Richard Droubay had a

life expectancy of 34.5 years, and that the present value of his future earnings and support is $307,066.00;

(b) That said amount should be reduced by ten per cent (10%) or $30,706.00 to reflect that amount which the decedent likely would have expended for his own living expenses;

(c) That because the defendant has strongly urged the court to reduce the future support figures by the amount of income tax applicable thereto, that factor has been taken into consideration, despite the fact that it is the court's view that this factor involves some speculation and need not necessarily be taken into account in such cases;

(d) That considering the decedent's expectable income and the number of exemptions he would be entitled to claim, and using the standard deduction, a reasonable percentage of the decedent's net future earnings subject to tax would be twelve per cent (12%) thereof, or $33,164.00; and that therefore the present value of Droubay's net after-tax earnings and support is $243,196.00;

(e) That under applicable Utah law, said net amount of lost earnings and support should be distributed among the Droubay plaintiffs on the basis of one-third thereof to the surviving spouse and the remainder in equal shares to the three surviving children; this provides the plaintiff Nancy Jeanne M. Droubay with $81,066.00 and each of the Droubay children with $54,043.33, for this particular damage element;

(f) That to these figures there should be added the amount of $30,000.00 to the plaintiff Nancy Jeanne M. Droubay, for her loss of assistance and services, loss of probability of an inheritance and loss of her husband's society, companionship and association;

(g) That to these figures there should be added the amount of $50,000.00 to each of the surviving children of John Richard Droubay, for their respective loss of nurture, guidance and training of their father;

(h) That there should be further added to the recovery of the plaintiff Nancy Jeanne M. Droubay, the amount of $1,162.04, the same being the amount of funeral expenses she paid in connection with the death of her husband; and

(i) That from the recovery of each of the respective Droubay plaintiffs, the court should deduct his or her proportionate share of the $50,000.00 to be paid by the defendant Judy G. Kelley by way of pretrial settlement of the plaintiffs' claims against said defendant consistent with Conclusion No. 17 below. The amount of said reduction for the plaintiff Nancy Jeanne M. Droubay is $6,050.00 (12.1%) and for each of the surviving Droubay children, $5,650.00 (11.3% each).

15. The damages recoverable by each of the Droubay plaintiffs from the defendant United States of America, taking into consideration the various factors enumerated above, are as follows:

Nancy Jeanne M. Droubay $106,178.04
Christine Estelle Droubay 98,393.33
Richard John Droubay 98,393.33
Julie Ann Droubay 98,393.34

16. In making these damage determinations, the court has considered the age of the decedents, their health, expectations, earning ability, industry, frugality, prospect of increase of income, the number, age and situation of those dependent upon them for support, and the decedents' previous disposition to support them well. The court, in making this determination, has attempted to determine, as accurately as is possible in such wrongful death actions, what the pecuniary benefit from the continuance in life of the respective decedents is worth under all the circumstances.

17. The defendant United States of America is entitled to have offset

against the damage award in this action, the amount of $50,000.00. This is the amount to be received by plaintiffs from the defendant Judy G. Kelley by way of pre-trial settlement of the plaintiffs' claims against said defendant. This $50,000.00 offset shall be apportioned among the various plaintiffs on the basis of the percentage which the recovery of each respective plaintiff bears to the total recovery allowed against the defendant United States of America.

18. Taking into account the time and effort expended, the result obtained, and all other relevant factors, plaintiffs' counsel are entitled to recover as attorneys' fees in this action, twenty-five per cent (25%) of the amounts herein awarded to the plaintiffs, as provided for under the Federal Tort Claims Act.

19. Plaintiffs, as the prevailing parties in these actions, are entitled to recover from the defendant, the United States of America, their costs in these actions.

20. Judgment in accordance with these Conclusions of Law is to be forthwith entered.