**Gail COLLINS, et al.,**
**Plaintiffs-Appellees,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

No. 84–4837.

United States Court of Appeals,
Fifth Circuit.

March 3, 1986.

Colette J. Winston, Jeffrey F. Axelrad, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

Elwood C. Stevens, Jr., William D. Hunter, Morgan City, La., W. Arthur Abercrombie, Baton Rouge, La., for plaintiffs-appellees.

Before CLARK, Chief Judge and BROWN and GEE, Circuit Judges.

GEE, Circuit Judge:

The United States appeals the district court order denying its motion to dismiss for lack of subject matter jurisdiction; we affirm.

This case arises from a 1979 explosion at the Belle Isle salt mine in southern Louisiana and certain governmental conduct occurring before that explosion. For the purpose of deciding defendant's motion to dismiss, the district court found that in March 1977 a Mine Safety and Health Administration ("MSHA") inspector conducted a three-day inspection at the Belle Isle mine, owned and operated by Cargill, Inc. Based on instrument readings taken at that time, the inspector issued Imminent Danger Order No. 195, requiring that the mine be reclassified as "gassy" and closed until suitable safety equipment was installed. Later analysis of air samples taken by the inspector showed .3 percent methane by air analysis.[1] Plaintiffs maintain that Hugh D. Graham, the inspector's superior and the subdistrict manager for the MSHA's Southern Central District, terminated the Imminent Danger Order, suppressed or tampered with air samples, and instructed his subordinates to "lay off the methane" in subsequent inspections.[2] The mine was not reclassified as gassy; in June 1979, methane gas there exploded, killing five and injuring seventeen.

Plaintiffs, two injured miners and the widows of two dead miners, sued the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, et seq., alleging that its failure to reclassify the mine as gassy and require abatement of that condition represented the legal cause of the injuries and deaths at issue. The United States moved to dismiss, asserting that the allegedly negligent conduct fell within the discretionary function exception of 28 U.S.C. § 2680(a), that the United States was therefore exempt from liability under the Federal Tort Claims Act ("FTCA"), and that the district court was wanting in subject matter jurisdiction. The district court denied that motion and, on a later government motion for reconsideration or for certification for interlocutory

appeal, certified its order for interlocutory review pursuant to 28 U.S.C. § 1292(b).

The discretionary function exception, contained in 28 U.S.C. § 2680(a), provides that there shall be no liability under the FTCA on

> [a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The issue before us is whether the United States is exempt from FTCA liability because the alleged acts of negligence represent the exercise or performance of discretionary functions under § 2680(a).

Our analysis of this issue is guided by the Supreme Court's decisions in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed.2d 1427 (1953), and, more recently, in *United States v. Empresa De Viacao Rio Grandense*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) ("*Varig*"). In *Dalehite*, plaintiffs sued the United States on claims arising from a massive explosion of nitrate fertilizer being exported as part of a post-World War II United States relief program. Plaintiffs asserted that the government had been negligent in drafting and adopting the fertilizer export program as a whole, in various phases of the manufacturing plan, and in policing shipboard loading. The Supreme Court held that the government's conduct came within the discretionary function exception, stating that

> [i]t is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. Where there is room for pol-

---

**1.** According to 30 C.F.R. § 57.21–1(c), a mine is gassy and is to be operated as such if a concentration of 0.25 percent or more, by air analysis, of flammable gas is detected.

**2.** On August 18, 1981, Graham pled guilty to conspiracy to defraud the government.

icy judgment and decision, there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. 346 U.S. at 35–36, 73 S.Ct. at 967–68 (footnote omitted), *quoted with approval in Varig*, 104 S.Ct. at 2764. The Court concluded that the discretionary function exception applied to the cabinet-level decision to institute the export program, to the decision not to experiment further to determine the fertilizer's explosive characteristics, and to the manufacture and labelling of the fertilizer according to government specifications. 346 U.S. at 37–42, 73 S.Ct. at 969–71.

In *Varig*, the Supreme Court further clarified the discretionary function exemption. The two cases before the Court in *Varig* involved in-flight fires and consequent destruction of aircraft that the FAA or its predecessor had certified under a spot-check certification program. In fact, the planes did not meet FAA standards and may never have been inspected at all. Plaintiffs alleged that the FAA would have discovered the defects had it conducted a plane-by-plane inspection of the aircraft instead of delegating responsibility for satisfying FAA standards to airplane manufacturers, with periodic spot checks to encourage compliance. Here, too, the Supreme Court determined that the alleged negligent conduct came within § 2680(a).

The unanimous Court rejected the proposition that *Dalehite* no longer represents a valid interpretation of the discretionary function exception. 104 S.Ct. at 2764. To the *Dalehite* analysis, the Supreme Court observed that it is impossible

> to define with precision every contour of the discretionary function exception.... [Nevertheless] several factors [are] useful in determining when the acts of a Government employee are protected from liability by § 2680(a). First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.... Thus,

the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.

*Id.* at 2765. A second aspect of the exception is that it plainly encompasses "the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." *Id.* (footnote omitted). This reflects Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.*

Having examined § 2680(a), the Supreme Court considered at some length the statutory and regulatory discretion granted to the Secretary of Transportation to decide what inspection system to adopt for enforcing safety standards and the discretion granted an inspector to determine how extensively to conduct a spot-check of a specific aircraft. As to the former, the Court stated that "[w]hen an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Id.* at 2768. As to the latter, the Court reiterated its conclusion in *Dalehite* that the discretionary function exception applies when government employees perform duties in accordance with agency directives. *Id.* at 2768–69 (citing *Dalehite*, 346 U.S. at 36, 73 S.Ct. at 968).

In the present case, the government advocates radically extending *Varig* to mean that whenever challenged conduct is regulatory in nature, the conduct is per se discretionary and, as such, shielded from exposure to private tort actions. It is therefore irrelevant, according to the government, whether the employee whose conduct is challenged was granted any choice whether or not to act as he did. Quoting *General Public Utilities Corp. v. United States*, 745 F.2d 239, 245 (3d Cir.1984),

*cert. denied,* —— U.S. ——, 105 S.Ct. 1227, 84 L.Ed.2d 365 (1985), the government asserts that "[r]egulatory activities are within the exception, not because alternatives exist in particular circumstances, but because of the fundamental character of the role assigned to the agency." This character alone, the government claims, is sufficient to invoke § 2680(a) in today's case. Responding to the second factor in *Varig,* the government argues that any judicial inquiry into allegedly negligent regulatory conduct exposes the MSHA to judicial second-guessing because the inquiry ultimately touches on the manner of enforcing regulatory standards.

 We reject the government's argument that *Varig* exempts the United States from liability whenever challenged conduct is regulatory in nature. Neither the language nor the structure of the decision in *Varig* supports such a view. While "the discretionary acts of the Government acting in its role as regulator of the conduct of private individuals" are within § 2680(a), *Varig,* 104 S.Ct. at 2765, this does not mean that all regulatory acts are discretionary acts.[3] Following *Dalehite* and *Varig,* we are instructed that there is discretion under § 2680(a) when "there is room for policy judgment and decision...." The exception therefore comprehends (1) "the initiation of programs and activities" and (2) "determinations made by executives or administrators in establishing plans, specifications or schedules of operations." The exception extends to "acts of subordinates in carrying out the operations of government *in accordance with official directions." Dalehite,* 346 U.S. at 35–36,

73 S.Ct. at 967–68 (emphasis added). Complemented with the learning from *Varig* we know that the United States is not liable for damages based on challenges necessarily directed at an agency's discretion, if it exists, in determining the extent to which it will regulate or the manner in which this will be done, even if the regulations being enforced are mandatory.[4] Throughout an analysis of the discretionary function exception we must be mindful that a purpose of the exception is to prevent judicial second-guessing of agency decisions that involve considerations of social, economic, or political policy. 104 S.Ct. at 2765.

 In the context of a challenge to a subordinate's conduct, *Dalehite* and *Varig* demonstrate that the subordinate's conduct is not within § 2680(a) just because the conduct is regulatory in nature. Section 2680(a) protects only discretionary conduct; not all regulatory conduct is discretionary conduct. Discretionary conduct requires room for policy analysis and judgment. *Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968. If an agency has the authority to do so, it may entrust to a subordinate's discretion decisions on the extent or manner in which regulations, even mandatory regulations, will be enforced where the decision to be made entails balancing considerations of social, economic, or political policy. This does not necessarily mean, though, that the employee whose conduct is being challenged must have made a policy decision: if an employee acts in accordance with official directions, the conduct is within § 2680(a). *Id.* In both cases, § 2680(a)

---

3. To the extent that the holding in *Hylin v. United States,* 755 F.2d 551, 554 (7th Cir.1985) (per curiam), supports the government's position, we find it unpersuasive. *Hylin* interprets *Varig* accurately, we think, to mean that

> [i]f the regulatory inspection and enforcement activities of an agency require its employees to exercise discretion in performing their duties, the discretionary function exception bars tort claims against the government based upon those performances.

755 F.2d at 553. We disagree with *Hylin,* however, that the presence of discretion in any aspect of the regulatory process means that at

any stage of it negligent conduct is within § 2680(a). Hence, in the context of the Metal and Nonmetallic Mine Safety Act of 1966, discretion over the terms of an order should not necessarily mean that there is discretion over whether to issue an order. 30 U.S.C. § 727(a), (b) (repealed 1977).

4. At least one of the regulations before the Supreme Court in *Varig* was a mandatory regulation. *See S.A. Empresa De Viacao Aerea Rio Grandense v. United States,* 692 F.2d 1205, 1207 (9th Cir.1982).

applies because challenging the employee's conduct also challenges the agency's discretion to implement a particular regulatory scheme. *Varig,* 104 S.Ct. at 2768.

■ According to the district court, plaintiffs in today's case challenge two categories of conduct: (1) terminating Imminent Danger Order No. 195 in March 1977 without further investigation and (2) failing to reclassify the mine as gassy despite evidence on various occasions from 1973 until 1979 that methane levels exceeded .25 percent. None of this conduct involved the initiation of programs or activities or determinations made in establishing plans, specifications, or schedules of operations, nor do plaintiffs challenge the agency's decision on the system by which it will regulate. Plaintiffs' claims of negligent conduct focus entirely on the acts of subordinates in "carrying out [or failing to carry out] the operations of government in accordance with official directions"—in this instance statutory and regulatory provisions. *Dalehite,* 346 U.S. at 35–36, 73 S.Ct. at 967–968. As did the Supreme Court in *Dalehite* and in *Varig,* we must examine the allegedly negligent conduct of the government employees in light of the statutory and regulatory authority for that conduct, determining whether the alleged misconduct was undertaken in accordance with official directions. *Dalehite,* 346 U.S. at 36, 38–42, 73 S.Ct. at 968, 969–71; *Varig,* 104 S.Ct. at 2768–69.

On March 21, 1977, when the inspector issued Imminent Danger Order No. 195, the controlling federal statute was the now-repealed Federal Metal and Nonmetallic Mine Safety Act, 30 U.S.C. §§ 721 *et seq.* (repealed 1977). According to then § 727(d), an imminent danger order "may be annulled, canceled, or revised by an authorized representative of the Secretary [of the Interior]." Thus, absent some mandatory regulation, the decision to terminate Imminent Danger Order No. 195 represented a choice clearly delegated to a subordinate. But the presence of a choice does not necessarily mean that there is discre-

tion under § 2680(a). Discretion within 2680(a) requires that "there is room for policy judgment and decision." *Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968. *See also Smith v. United States,* 375 F.2d 243, 246 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct 76, 19 L.Ed.2d 106 (1967). It is apparent that the decision to annul Imminent Danger Order No. 195 was a decision only remotely related, if related at all, to social, economic, or political policy. Given the absence of any such policy consideration advanced to support that decision, common sense dictates that once the order was issued the decision to rescind it or to leave it intact should have been made on the primary basis of whether the dangerous condition that mandated it originally had abated. It had not, but nevertheless the order was cancelled. The government suggests no policy reason for that action, and none is apparent to us. The district court correctly found that § 2680(a) does not immunize the United States from liability for Graham's decision to terminate Imminent Danger Order No. 195.

Similarly, we conclude that the district court did not err in finding that § 2680(a) does not apply to the alleged failure to reclassify the mine as gassy on those occasions from 1973 until 1979 when methane levels exceeded .25 percent. According to 30 C.F.R. § 57.21–1(c) (1977),[5] identified as a mandatory provision,

> a mine shall be deemed gassy, and thereafter operated as a gassy mine, if ... [a] concentration of 0.25 percent or more, by air analysis, of flammable gas ... has been detected....

A subordinate charged with enforcing 30 C.F.R. § 57.21–1(c) during the relevant period therefore had no room for policy judgment or decision once methane levels exceeding .25 percent had been detected. Failure to reclassify the mine as gassy represented disobedience of official directions, simple and unadorned. The discretionary function exception of § 2680(a) does not immunize the United States from

---

5. The language of 30 C.F.R. § 57.21–1(c) re- mained unchanged during the relevant period.

liability for the failure to reclassify the mine as gassy.

With respect to the second aspect of *Varig*, we are convinced that our analysis in this case does not amount to judicial second-guessing of decisions entrusted to agency discretion. We disagree with the government that the questioning of any regulatory act necessarily involves judicial second-guessing. Determining whether a decision involves policy at all is not the same as scrutinizing the correctness of that policy decision. To the extent than an employee refuses to carry out a mandatory statute or regulation, one which leaves him no discretion in the manner or extent to which it will be enforced, the employee is simply disobeying a flat command. In this instance, any available discretion had been exercised when the command was adopted; appellees' challenges do not threaten that discretion. It is certainly conceivable that, in a proper case, policy considerations, perhaps of an emergency nature, might dictate overriding such a command. As a possible example, the attempted rescue of a trapped miner might well justify entry into a "gassy" mine even though required safety equipment was inoperable, so that an order forbidding entry in such circumstances might properly be annulled. But no such justification is even suggested here, and none is apparent to us. That being so, we conclude that on the record as it presently stands no act of discretion was involved in today's case.

Having determined that the alleged acts of negligent conduct are not within 28 U.S.C. § 2680(a), we AFFIRM the district court order denying the government's motion to dismiss.

JOHN R. BROWN, Circuit Judge, concurring:

I concur in both the result and the court's opinion. I add this concurrence to make clear that the Federal Torts Claims Act is not dead. The FTCA is not, as government counsel think and continue to urge, confined to the typical fender bender automobile intersectional collision between a postal truck and a citizen's child-filled station wagon. We have still the significant, still valid, decisions in *Indian Towing*,[1] *Rayonier*[2] and *Eastern Airlines*[3] which recognized FTCA liability in areas traditionally thought to have some governmental activity immunity that inherently involved extensive operational judgment, and hence, "discretion."

Added to this is the extensive judicial history reflected in the operation and application of the FTCA—of which Congress has peculiar knowledge—in which the government has been found liable in areas in which the governmental actors inherently and necessarily had to exercise much careful selection of action and, at least, operational judgment. With nothing but rudimentary research, these examples have been routinely chosen from the annotations to 28 U.S.C. § 2680 in the United States Code Service to illustrate that the discretionary function exception has traditionally been narrowly construed by the courts: *Moyer v. Martin Marietta Corp.*, 481 F.2d 585 (5th Cir.1973) (§ 2680(a) does not bar suit for death of test pilot due to alleged negligence in construction of ejection seat); *United States v. Hunsucker*, 314 F.2d 98 (9th Cir.1962) (government liable to landowner for damages caused by defective sewage disposal system at air force base); *Seaboard C.L.R. Co. v. United States*, 473 F.2d 714 (5th Cir.1973) (government liable for negligently constructed drainage ditch causing train derailment); *Pierce v. United States*, 142 F.Supp. 721 (E.D.Tenn.1955) *aff'd.* 235 F.2d 466 (6th Cir.1956) (erection of defective electrical substation at munitions plant and failure to warn workers subjected government to liability); *Ingham v. Eastern Airlines, Inc.*, 373 F.2d 227 (2d Cir.1967) *cert. denied* 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (failure of air traffic

1. 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955);

2. *Rayonier, Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957);

3. *Eastern Airlines, Inc. v. Union Trust Co.* aff'd sub. nom., *United States v. Union Trust Co.*, 350 U.S. 907, 76 S.Ct. 192 100 L.Ed. 796 (1955).

controller to report weather changes); *Sullivan v. United States,* 299 F.Supp. 621 (N.D.Ala.1968) *aff'd.* 411 F.2d 794 (5th Cir. 1969) (negligently publishing incorrect airport lighting chart); *Driscoll v. United States,* 525 F.2d 136 (9th Cir.1975) (failure to install warning devices, barriers, and crosswalks); *Hendry v. United States,* 418 F.2d 774 (2d Cir.1969) (government liable for medical decision by governmental psychiatrist that plaintiff was unfit for sea duty); *White v. United States,* 317 F.2d 13 (4th Cir.1963) (Veterans Administration hospital permitting patient with suicidal tendencies to have freedom of hospital grounds resulting in his suicide); *Underwood v. United States,* 356 F.2d 92 (5th Cir.1966) (negligence of government psychiatrist in failing to give wife information on patient's threats on wife's life); *Supchak v. United States,* 365 F.2d 844 (3rd Cir. 1966) (Veterans' Administration hospital's failure to admit emergency patient); *Baker v. United States,* 226 F.Supp. 129 (S.D. Iowa 1964) *aff'd.* 343 F.2d 222 (8th Cir. 1965) (injuries to mental patient for attempted suicide from negligent failure to properly supervise and restrain patient); *Somerset Seafood Co. v. United States,* 193 F.2d 631 (4th Cir.1951) (loss of vessel from stranding on wreck of negligently unmarked battleship); *Bevilacqua v. United States,* 122 F.Supp. 493 (W.D.Pa.1954) (failure to light lanterns at lock resulting in drowning of two occupants of vessel); *Everitt v. United States,* 204 F.Supp. 20 (S.D. Tex.1962) (vessel sinking from striking submerged piling); *American Exchange Bank v. United States,* 257 F.2d 938 (7th Cir. 1958) (absence of handrail on post office building steps); *Hatahley v. United States,* 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956) (negligence by government agents in impounding livestock); *Dahlstrom v. United States,* 228 F.2d 819 (8th Cir.1956) (excessive noise by Civil Aeronautics Administration aircraft to establish approach patterns); *Friday v. United States,* 239 F.2d 701 (9th Cir.1957) (negligence of automobile driver lacking adequate sleep); *United States v. DeCamp,* 478 F.2d 1188 (9th Cir.1973), *cert. den.* 414 U.S. 924, 94 S.Ct. 232, 38 L.Ed.2d 158 (failure to equip bulldozers with canopy guards); *United States v. White,* 211 F.2d 79 (9th Cir.1954) (failure to warn of danger of unexploded shells to one collecting scrap metal on army base); *United Airlines, Inc. v. Wiener,* 335 F.2d 379 (9th Cir.1964) (CAB tower operator failure to inform commercial flights of hazardous training procedures in the area); *El Paso Natural Gas Co. v. United States,* 343 F.2d 145 (9th Cir.1965) (absence of warning device on wires connecting Coast Guard station with the mainland); *United States v. Washington,* 351 F.2d 913 (9th Cir.1965) (absence of warning devices on power line to inform pilots of its existence); *Wenninger v. United States,* 234 F.Supp. 499 (D.Del.1964) *aff'd.* 352 F.2d 523 (3d Cir.1965) (absence of warning of dangerous activities near radio beam used as navigational aid); *Murray v. United States,* 327 F.Supp. 835 (D.Utah 1971) *aff'd.* 463 F.2d 208 (10th Cir.1972) (publication and distribution of incorrect aeronautical information regarding available runway lighting, etc.); *Jablonski v. United States,* 712 F.2d 391 (9th Cir.1983) (failure to warn victim of violent tendencies of a patient); *overruled on other grounds Matter of McLinn* 739 F.2d 1395 (9th Cir.1984) (en banc); *Petty v. United States,* 740 F.2d 1428 (8th Cir.1984) (negligence of swine flue inoculations); *Bryant v. United States,* 565 F.2d 650 (10th Cir.1977) (negligent operation of boarding school by Bureau of Indian Affairs); *Butler v. United States,* 726 F.2d 1057 (5th Cir.1984) (repairs to adjacent ocean seawall.)

The narrow construction given to the discretionary function exception is abundantly apparent even from this brief survey of the cases which appear in the pages of the Federal Reporter. The decisions are of vital significance because they clearly reflect the congressional intent in enacting the FTCA. The judgments which arise from these decisions must be paid by an appropriation out of the public purse, and, as I will illustrate, the repeated payment of these judgments by the Congress consti-

tutes a Congressional approval of the approach adopted by these Courts.

Three Supreme Court cases illustrate the significance of Congressional acts of appropriation as important evidence in the task of divining Congressional intent. *Ex Parte Endo,* 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944), *Brooks v. Dewar,* 313 U.S. 354, 61 S.Ct. 979, 85 L.Ed. 1399 (1941), *Isbrandtsen-Moller v. United States,* 300 U.S. 139, 57 S.Ct. 407, 81 L.Ed. 562 (1937). In order to be probative of Congressional intent, an appropriation "must plainly show a purpose to bestow the precise authority which is claimed." *Ex Parte Endo,* 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243, 256 fn. 24 (1944). This is fully satisfied in this case, since Congress has specifically appropriated money to pay FTCA judgments. The attention of the Congress is specifically drawn to judgments entered under the Tort Claims Act by the statute which authorizes the payment of judgments entered against the United States. *See* 31 U.S.C. § 1304(a)(3)(A).[4] The information regarding the narrow construction given to § 2680(a) was in the possession of Congress at the time of each appropriation, it was plentiful, and it arose from a cross-section of the Courts of Appeal and the District Courts in the federal system. Cf. *Brooks v. Dewar,* 313 U.S. 354, 61 S.Ct. 979, 85 L.Ed. 1399, 1403 (1941). The repeated payment of these judgments is strong indication that Congress, rather than dissatisfied with these judicial deci-sions and developments, has ratified them as an appropriate fulfillment of the congressional intent in enacting the FTCA.

Of equal importance, in enacting the FTCA, Congress had a dual objective. First, it wished to compensate citizens for damages inflicted by the increasingly complex operations of government. Second, and equally as vital, was its desire to free itself from the burdensome and highly unsatisfactory system of private bills which had evolved as a means of assuaging the "feeling that the Government should assume the obligation to pay damages for the misfeasance of employees in carrying out its work." *Dalehite v. United States,* 346 U.S. 17, 24, 73 S.Ct. 956, 962, 97 L.Ed. 1428, 1435 (1953). As the *Dalehite* court observed, the private bill device was "notoriously clumsy"[5] and the provision of a "simplified recovery procedure for the mass of claims was imperative." *Id.* The Tort Claims Act, then, was designed to afford easy and simple access to the federal courts for persons injured by the activities of government without the need to rely on such unwieldy means of restitution.

Every act of a rational being involves some choices—speed up or slow down, turn right or left, put helm port or starboard, go full astern or full ahead, tighten brakes or replace them, glide in or circle, use general anesthetic or local, use a human heart or a JARVIK 7. It is plain that the discretionary function exception of section 2680(a) must be applied with restraint if the Tort

---

**4.** The text of this provision reads:

 (a) Necessary amounts are to be appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when—

 . . . . .

 (3) the judgment, award, or settlement is payable
 (A) under section ... 2672 ... of title 28 [the Federal Tort Claims Act].

**5.** The massive drain of congressional and administrative resources consumed by the flood of private bills which existed at the time of the enactment of the FTCA is illustrated by the following statistics gleaned from a House report quoted in footnote nine of *Dalehite.*

 In the 68th congressional session, 2,200 private bills were introduced, of which 250 became law. In the 70th congressional session, there were 2,268 private bills presented for consideration, of which 144 were enacted for the benefit of tort victims accompanied by appropriations of what was then a modest sum of $562,000 for their compensation. The 74th and 75th congressional sessions witnessed the introduction of over 2,300 private bills each; the 76th, in turn, saw the introduction of over 2,000 bills of which 315 became law together with compensatory appropriations of $826,000. In the 77th, 593 of the more than 1,800 private bills presented became law accompanied by over $1,000,000 in compensatory appropriations. The high water mark of the deluge was reached in the 78th Congress when the 549 private bills enacted carried compensatory awards of $1,355,767.12.

**1234**

Claims Act is to achieve the dual purposes which motivated its enactment.

Unless section 2680(a) is read carefully, it will insulate the Government from nearly all tort liability, contrary to the initial expectation that citizens would receive recompense when their injuries were caused by the Government. Unless section 2680(a) is read carefully, it will return us to the days when Congress was forced to award compensation through the clumsy mechanism of private bills, contrary to the expectation of a streamlined remedial procedure under the Tort Claims Act.

This concurrence stands for my conviction that section 2680(a) be carefully applied lest the dual objectives of Congress in enacting the FTCA fail.